**Michael A. COSTANTINO, et al., on behalf of the class of plaintiffs, Plaintiffs–Appellees, Cross–Appellants,**

v.

**TRW, INC.; Jake Schoepler, Secretary, Board of Administrators TRW Salaried Pension Plan, Defendants–Appellants, Cross–Appellees.**

Nos. 91–3768, 91–3769.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 21, 1992.

Decided Jan. 10, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied March 29, 1994.

---

Robert D. Gary (briefed), Lorain, OH, Leonard F. Carr, Carr, Feneli & Carbone, Mayfield Heights, OH, Judith A. Lehnowsky (briefed), Rocky River, OH, Eric H. Zagrans (argued), Leslie Yvonne Spencer, Garfield & Zagrans, Cleveland, OH, for Michael A. Costantino.

Kim F. Bixenstine, Jones, Day, Reavis & Pogue, Cleveland, OH, Joseph M. David, Jones, Day, Reavis & Pogue, Washington, DC, William H. Powderly, III, Jones, Day, Reavis & Pogue, Pittsburgh, PA, William L. Sollee (argued and briefed), Ivins, Phillips & Barker, Washington, DC, for TRW, Inc. and Jake Schoepler.

Before JONES and SILER, Circuit Judges, and PECK, Senior Circuit Judge.*

## AMENDED OPINION

NATHANIEL R. JONES, Circuit Judge.

This class action challenges Defendants' calculation of Plaintiffs' early retirement benefits under Defendants' pension plan. Plaintiffs claim that the retroactive application of interest rates established in section 1139 of the Tax Reform Act of 1986 was unconstitutional, denying them the proper amount of their vested early retirement benefit. Alternatively, Plaintiffs argue that even if the retroactive application of these rates was constitutional, Defendants improperly calculated Plaintiffs' benefits in violation of Section 204(g) of the Employment Retirement Income Security Act (ERISA) (29 U.S.C. § 1054(g)), and I.R.C. § 411(d)(6), both of which prohibit employers from amending pension plans to eliminate or decrease early retirement benefits or subsidies.[1] Defendants respond that Plaintiffs' claims should be dismissed due to Plaintiffs' failure to exhaust administrative remedies, and that the benefits in question were properly calculated.

The federal district court granted in part and denied in part both parties' motions for summary judgment, rejecting Plaintiffs' claim that the retroactive application of section 1139 was unconstitutional, but ruling in favor of Plaintiffs on their claims that their benefits were miscalculated, and ordering Defendants to recalculate Plaintiffs' lump sum benefits. Both parties appealed. We direct the district court to modify its order to reflect the proper rule for calculating the applicable interest rate, and otherwise affirm.

---

\* The Honorable John W. Peck, Senior Circuit Judge, deceased September 7, 1993, participated in the oral argument but not the opinion in this case.

1. In the court below, Plaintiffs also alleged other violations of ERISA, as well as violations of the Racketeering–Influenced and Corrupt Organizations Act (RICO) and state common law. The district court dismissed these claims in response to Defendants' motion for summary judgment, and they are not before us on appeal. *See Boyd v. Ford Motor Co.*, 948 F.2d 283, 284 (6th Cir. 1991) (issues raised in the district court but not on appeal are considered abandoned and not reviewable), *cert. denied*, —— U.S. ——, 112 S.Ct. 1481, 117 L.Ed.2d 624 (1992).

## Facts

The plaintiff class consists of approximately 1,000 participants in TRW, Inc.'s salaried pension plan (the Plan) who retired between January 1, 1985, and October 22, 1986,[2] and who elected to receive their early retirement distributions in the form of a lump sum. The Plan, which was a defined benefit plan governed by ERISA, provided that participants who left TRW's employment at or after age 65 were entitled to normal retirement benefits in the form of a life annuity (monthly payments of a fixed amount for life). In addition, those who left TRW's employment after age 55 with ten or more years of service were entitled to "subsidized" early retirement benefits; their monthly payments for life beginning before age 65 were more valuable than monthly payments of the same amount that began at age 65 simply because their benefits lasted over a longer time.

As an alternative to receiving early retirement benefits in the form of a life annuity, eligible Plan participants could elect to receive their early retirement benefits in a lump sum consisting of the present value of the life annuity, calculated by discounting the annuity payments at an interest rate provided by the Plan. Until the Plan was amended on December 18, 1986, the subsidy was available to early retirees regardless of whether they elected the lump sum or the life annuity

options. Also, until December 18, 1986, the Plan provided that the interest rate was to be equal to an average of yields for Moody's "Aaa" Corporate Bonds for the first month of the calendar quarter (the Moody's rate). The Moody's rates for 1985 and 1986 were 12.08% and 10.05% respectively.

In 1984, Congress revised ERISA and the Internal Revenue Code through the Retirement Equity Act (REA).[3] The REA and subsequent Treasury Department temporary regulations required, *inter alia*, that the immediate interest rate set by the Pension Benefit Guaranty Corporation (PBGC) be the maximum rate used to calculate the present value of a lump sum distribution.[4] The PBGC rate was 9.75% in 1985 and 8.75% in 1986. Because the PBGC rates were lower than the Moody's rates, the use of the PBGC rates would have resulted in larger lump sum payments than those resulting from use of the Moody's rates. Although TRW amended its Plan in 1985 to comply with the REA, its amendment did not comply with the PBGC rate requirement. Thus, the members of the Plaintiff class, all of whom retired after enactment of the REA, received lump sum early retirement distributions determined at the Moody's rates. These distributions were smaller than what Plaintiffs would have received had Defendants complied with the PBGC rates.

2. The record is ambiguous as to whether the class period extends to October 22, or to October 28, 1986. The district court Memorandum and Order that granted in part and denied in part both parties motions for summary judgment, and the Order requiring TRW to recalculate Plaintiffs' benefits, both filed on July 25, 1991, indicate that the class period extended to October 22, 1986. Further, the October 22 date is in keeping with Defendants' original request to limit the scope of the class to those who retired before enactment of the 1986 Tax Reform Act, which was enacted on October 22, 1986. The Pre-trial Minutes of Proceedings, filed October 16, 1987, indicate that the court granted Defendants' request and asked Defendants to submit a proposed amended order regarding the scope of the class. However, the court's Order regarding the scope of Plaintiffs' class, filed on February 22, 1988, indicates that the class period extended to October 28, 1986. Presumably, this Order was drafted by Defendants. The civil docket sheet offers no indication that the court's Order of February 22, 1988, was ever revised or amended.

In Plaintiffs' motion for summary judgment, they used the October 22 date, but in their brief to this court, they use the October 28 date. Defendants' brief uses the October 22 date. Neither party discusses the discrepancy in their briefs. Because the district court's order that precipitated this appeal, the Order of July 25, 1991, uses the October 22 date, and because neither party raises on appeal the question of whether the use of this date in the court's July 25, 1991, Order was correct, we assume that the class period extended only to October 22, 1986, and not to October 28.·

3. *See* Pub.L. No. 98–397, 98 Stat. 1426 (1984) (amending ERISA, 29 U.S.C. §§ 1001–1461, and the Internal Revenue Code, I.R.C. §§ 401–419A.

4. *See* Temp. and Prop.Treas.Reg. § 1.417(e)–1T, 50 Fed.Reg. 29,371, 29,436 (1985). The temporary regulation states that it was intended only to provide guidance until the issuance of final regulations. The final regulations, issued in 1988, were retroactive to January 1, 1985. Treas.Reg. § 1.417(e)–1 (1993).

Congress superseded the maximum rate it had established in the REA in section 1139 of the Tax Reform Act of 1986 (TRA), which capped the allowable interest rate at 120% of the PBGC rate for distributions in excess of $25,000, and at the PBGC rate for distributions less than $25,000.[5] In addition, Congress made the Section 1139 interest rate retroactive for distributions in plan years beginning on or after January 1, 1985, except for distributions made in accordance with the interest rate requirements of the regulations under the REA. TRW actively lobbied for this amendment and its retroactive application.

TRW amended its Plan on December 18, 1986, retroactive to January 1, 1985, to conform with the interest rate changes made by section 1139 of the TRA.[6] It recalculated the retirees' lump sum distributions, and, when applicable, sent them supplemental benefits. However, even though the new rates were lower than the Moody's rates TRW had previously used, only 25% of the retirees received any supplemental benefits, because, in addition to changing the interest rate in the Plan, TRW eliminated the subsidy it formerly had provided to early retirees electing to receive lump sum benefits. Thus, the new interest rates were applied only to unsubsidized lump sum benefits. Under this system, many of the early retirees were actually entitled to a lower lump sum distribution than the one they already received under the old plan. To avoid any decrease in benefits, TRW amended its Plan again in 1988 to provide employees who retired during the class period with either the amount received under the old Plan or the amount received under the amended Plan, whichever was greater. The 1988 Plan amendments also allowed the PBGC rate to be applied to the subsidized early retirement benefit if the lump sum amount was no more than $25,000.

Plaintiffs filed their Complaint on August 5, 1986 and their motion for summary judgment on May, 26, 1989. Defendants filed their cross-motion for summary judgment on July 12, 1989. Granting in part and denying in part both parties' motions, the district court affirmed the constitutionality of section 1139, rejected Defendants argument that Plaintiffs' claims should be dismissed for Plaintiffs' failure to exhaust administrative remedies, and agreed with Plaintiffs' contention that Defendants violated ERISA § 204(g) and I.R.C. § 411(d)(6), by improperly calculating the present value of the early retirees' lump sum distributions. The court found two problems with Defendants' calculations: 1) Defendants improperly eliminated the subsidy for early retirees who were eligible for $25,000 or more in benefits and who elected to receive lump sum distributions; and 2) Defendants improperly applied the PBGC rate set at the beginning of the year rather than the rate that existed at the time of the distribution of benefits.[7]

### Issues

There are four issues before us on appeal:

I. Whether the district court correctly ruled that Plaintiffs were not required to exhaust their administrative remedies prior to filing an action against TRW in federal district court;

II. Whether the district court properly held that, in applying an interest rate cap retroactively to Plaintiffs' lump sum distributions, the Tax Reform Act of 1986 did not unconstitutionally deprive plaintiffs of vested property rights without due process, or deny them equal protection;

III. Whether the district court correctly ruled that, for Plaintiffs who have earned lump sum distributions of $25,000 or more (calculated at the PBGC rate), TRW must amend its Plan to pro-

---

**5.** *See* Pub.L. No. 99–514 § 1139, 100 Stat. 2085, 2487 (1986), *codified at* 29 U.S.C. § 1053(e), and 26 U.S.C. § 411(a)(11).

**6.** This retroactive amendment mooted one of Plaintiffs' original claims in the court below, namely their claim that Defendants failed to comply with the REA's interest rate requirement.

**7.** The district court also held that, if upon recalculation in accordance with the court's judgment it turns out that the retirees are entitled to more benefits, then they will also be entitled to interest on the underpayments. This aspect of the court's holding has not been challenged on appeal.

vide a lump sum benefit equal to the present value of the Plan's subsidized early retirement annuity, calculated at 120% of the PBGC rate;

IV. Whether the District Court correctly ruled that the rate to be used in calculating the lump sum distributions shall be the section 1139 rate in effect on the date that the distribution occurred.

## Discussion

### I. *Exhaustion of Administrative Remedies*

■ Even though we review a district court's grant of summary judgment *de novo*, *Rector v. General Motors Corp.*, 963 F.2d 144, 146 (1992), and this non-deferential standard of review applies to all of the other issues presently before us, on the issue of exhaustion of administrative remedies, the district court is to be afforded a more deferential standard of review. *Curry v. Contract Fabricators Inc. Profit Sharing Plan*, 891 F.2d 842, 846 (11th Cir.1990) ("[T]he decision whether to apply the exhaustion requirement is committed to the district court's sound discretion and can be overturned on appeal only if the district court has clearly abused its discretion."); *Baxter v. C.A. Muer Corp.*, 941 F.2d 451, 453–54 (6th Cir.1991) (adopting this standard).

This court has held that, though ERISA does not explicitly require exhaustion of administrative remedies, "[t]he administrative scheme of ERISA requires a participant to exhaust his or her administrative remedies prior to commencing suit in federal court." *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir.1991); *see also Baxter*, 941 F.2d at 453; *Springer v. Wal–Mart Assoc. Group Health Plan*, 908 F.2d 897, 899 (11th Cir.1990); *Makar v. Health Care Corp. of Mid–Atlantic*, 872 F.2d 80, 82–83 (4th Cir.1989). Not only does the legislative history of ERISA support this proposition, *see Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir.1980), but also the relevant ERISA provision reads: "[E]very employee benefit plan shall ... afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2).

*See Mason v. Continental Group, Inc.*, 763 F.2d 1219, 1226–27 (11th Cir.1985), *cert. denied*, 474 U.S. 1087, 106 S.Ct. 863, 88 L.Ed.2d 902 (1986).

■ TRW argues that Plaintiffs' claims center on the proper *interpretation* of the Plan, which is best accomplished via administrative means. The important public policy of encouraging private rather than judicial resolution of disputes under ERISA would be served thereby. *See Kross v. Western Electric Co.*, 701 F.2d 1238, 1243–45 (7th Cir. 1983). TRW contends that simply because Plaintiffs' claims are founded on statutory rights does not preclude exhaustion of administrative remedies. *See id.* at 1245 (requiring exhaustion even though employees alleged that, in violation of 29 U.S.C. § 1140, employer discharged employees in order to prevent their benefits from vesting); *Mason*, 763 F.2d at 1222–27 (requiring exhaustion even though plaintiffs argued violation of 29 U.S.C. § 1140); *see also Drinkwater v. Metropolitan Life Ins. Co.*, 846 F.2d 821, 826 (1st Cir.) ("[T]his is a simple contract claim artfully dressed in statutory clothing. If we were to allow claimants to play this characterization game, then the exhaustion requirement would be rendered meaningless."), *cert. denied*, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988); *but see Amaro v. Continental Can Co.*, 724 F.2d 747, 750–52 (9th Cir.1984) (holding that exhaustion of administrative remedies was *not* required where plaintiffs alleged violation of 29 U.S.C. § 1140). To make every claim into a federal case would undermine the claim procedure contemplated by the Act. *Challenger v. Local Union No. 1 of Int'l Bridge*, 619 F.2d 645, 649 (7th Cir.1980).

■ Traditional exhaustion principles, however, include an exception for instances "when resort to the administrative route is futile or the remedy inadequate." *Amato*, 618 F.2d at 568 (quoting *Winterberger v. General Teamsters Auto Truck Drivers & Helpers Local Union 162*, 558 F.2d 923, 925 (9th Cir.1977)); *see also Springer*, 908 F.2d at 899; *Drinkwater*, 846 F.2d at 826. The district court ruled, in the exercise of its sound discretion, that because it would be

futile for Plaintiffs to follow the administrative process, they need not exhaust their administrative remedies. The court viewed Plaintiffs' suit as directed to the *legality* of TRW's amended Plan, not to a mere *interpretation* of it. Thus, if Plaintiffs were to resort to the administrative process, TRW would merely recalculate their benefits and reach the same result.

Moreover, in the instant case, Plaintiffs challenge the *constitutionality* of the retroactive provision of the TRA. Plaintiffs' constitutional argument is properly dealt with in federal court. An administrative hearing on this issue would be pointless, and, if the section at issue were unconstitutional, such a hearing could not lead to an appropriate remedy. Whether or not plaintiffs' remaining claims are of the appropriate type for exhaustion of administrative remedies, the district court clearly did not abuse its discretion in determining that the administrative process would be inappropriate with regard to the constitutional issue.

Further support for the district court's position may be found by looking to the purposes of administrative exhaustion. If these purposes would not be furthered, there would be no sense in exhausting administrative remedies. The purposes of exhausting administrative remedies were discussed in *Makar*, 872 F.2d at 83:

(1) To help reduce the number of frivolous law-suits under ERISA.

(2) To promote the consistent treatment of claims for benefits.

(3) To provide a nonadversarial method of claims settlement.

(4) To minimize the costs of claims settlement for all concerned.

(5) To enhance the ability of trustees of benefit plans to expertly and efficiently manage their funds by preventing premature judicial intervention in their decision-making processes.

(6) To enhance the ability of trustees of benefit plans to correct their errors.

(7) To enhance the ability of trustees of benefit plans to interpret plan provisions.

(8) To help assemble a factual record which will assist a court in reviewing the fiduciaries' actions.

This lawsuit can hardly be said to be frivolous, and there is little likelihood that this matter will become any less adversarial. Costs for all parties would probably increase if Plaintiffs were forced to go back through the administrative process. TRW is unlikely to change its position through a "correction of error" or different "interpretation" of the plan given its stance in the instant litigation, and the factual record is already well assembled. Consequently, exhaustion of administrative remedies in the present case would be purposeless, as well as futile and inadequate.

**II.** *Constitutionality of Section 1139's Retroactivity*

Plaintiffs argue that the retroactive application of section 1139 is unconstitutional because it deprived them of a vested right without due process of law, and denied them equal protection of the law, in violation of the Fifth Amendment. With regard to the due process claim, Plaintiffs contend that they had a legitimate claim of entitlement to the computation of their lump-sum distribution under the federal law as it stood on the date of their retirement (namely, the unadjusted PBGC rate—*see* 26 U.S.C. § 417(e)(3)). Due to the mandatory language of the federal statute—that the present value of a lump-sum distribution from a qualified plan "*shall* be determined as of the date of distribution and by using an interest rate not greater than the interest rate which would be used (as of the date of the distribution) by the Pension Benefit Guaranty Corporation ...," *id.*—Plaintiffs assert that they obtained a constitutionally protected property interest. *See Daniels v. Woodbury County*, 742 F.2d 1128, 1132–33 (8th Cir.1984) (holding that plaintiffs were entitled to minimum due process in administration of county's general relief program because relevant statute and program rules were "mandatory" in nature, and thus created an expectation in the receipt of general assistance for all people eligible); *Griffeth v. Detrich*, 603 F.2d 118, 121 (9th Cir.1979) ("the authorizing statute coupled with the implementing regulations of

the county creates a legitimate claim of entitlement and expectancy of benefits in persons who claim to meet the eligibility requirements" for general relief), *cert. denied,* 445 U.S. 970, 100 S.Ct. 1348, 64 L.Ed.2d 247 (1980). This protected property interest was taken from them by retroactive application of Section 1139.

Plaintiffs' equal protection argument is that section 1139 was not made retroactive for retirees who, from 1984 to 1986, received lump-sum distributions that were calculated in conformance with the REA and the temporary regulations that required use of the PBGC rate. This distinction between similarly situated groups, they claim, is arbitrary and irrational.

■ In challenging the constitutionality of economic legislation, as a violation of due process, the retirees must overcome the burden discussed in *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984) (quotations and citations omitted):

> It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.
>
> ... [T]he strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively. Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches.
>
> ... [O]ur cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.

In *Gray,* the Court rejected a due process challenge to the retroactive application of an ERISA amendment, finding a rational legislative purpose for retroactivity to exist. This same lenient rational basis standard is to be applied to equal protection challenges to economic legislation. *See United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 177, 101 S.Ct. 453, 460, 66 L.Ed.2d 368 (1980) (denying equal protection challenge to legislation phasing out retirement benefits to some employees but·not to others, because Congress had not acted in "patently arbitrary or irrational way.").

In the instant case, a report of the United States Senate Finance Committee described a legislative purpose for the retroactivity provision of Section 1139:

> [T]he present-law cash out rules encourage plan participants to request a cash out of benefits in order to receive a favorable interest rate assumption on the cash out. The interest rates required to be provided under present law may lead employers to make plan distributions unavailable until normal retirement age because of an employer's concern about the solvency of the plan's assets when all terminating employees request lump-sum distributions.

S.Rep. No. 313, 99th Cong.2d Sess. 642 (1986). The district court, finding a rational basis for retroactivity to exist, maintained that "retroactive application protects to the fullest extent possible pension plan assets and allows for the continued availability of benefits at an early retirement age." J.A. at 50. As to the equal protection claim, the court wrote, "It is also rational for Congress to distinguish between the retirees and others who received lump sums based on the PBGC rate in light of the practical difficulties of allowing employers to seek refunds of these benefits." *Id.*

Plaintiffs' response is that Congress' chief concern was that employees would seek early retirement lump sum payments under the more favorable PBGC rate, thus threatening the solvency of pension plans and consequently the availability of early retirement options. Because Plaintiffs have already received their payments, Congress's purported "rational basis" does not apply to their cases. Further, if Congress were serious about its goal of pension plan solvency, it would apply section 1139 retroactively to *all* disbursements, not just those made in non-compliance with the PBGC rate. Thus, Plaintiffs claim,

the distinction between early retirees who received lump-sums from companies who disobeyed REA (with respect to the PBGC interest rate cap) and early retirees who received lump-sums from companies who used the PBGC rate is, at least, arbitrary, and at most irrational.

We reject this argument. It was neither arbitrary nor irrational for Congress to conclude that the retroactivity of section 1139 would further the goal of pension plan solvency. Applying Section 1139 retroactively only to those distributions that were not made in accordance with the PBGC rate takes into account the practical difficulties of seeking refunds from retirees. In short, Congress had a rational basis for making section 1139 retroactive and for distinguishing between retirees receiving the PBGC rates and those who did not. We therefore affirm the district court's holding that section 1139's retroactive application is constitutional.

**III.** *Calculation of Lump Sum Distributions Must Be Based on the Present Value of Subsidized Early Retirement Annuities*

The district court ruled that TRW had to amend its Plan to provide Plaintiffs with a lump sum benefit equal to the present value of the Plan's *subsidized* early retirement annuity, calculated at the section 1139 rate (120% of the PBGC rate), for lump sum amounts in excess of $25,000. According to the district court, when TRW amended the Plan to eliminate the early retirement subsidy from the recalculation of lump-sum distributions, it violated ERISA § 204(g) and I.R.C. § 411(d)(6), both of which are "anti-cutback rules" prohibiting employers from amending their plans to eliminate or decrease early retirement benefits or retirement-type subsidies.[8]

**A**

■ Defendants argue, first, that the section 1139 interest rates apply only to determine the present value of the retirees' "accrued benefits," which, by definition, include only the portion of the retirees' benefits that are unsubsidized. In the following section, we explain why this premise is incorrect. Meanwhile, even assuming for the purposes of the present section that Defendants' premise is true, we still cannot agree with Defendants' next contention—that because section 1139 does not apply to early retirement subsidies, the anti-cutback rules are somehow "irrelevant." To the contrary, not only are the anti-cutback rules *relevant* to Defendants' elimination of the subsidy under their 1986 Plan amendment, the rules *expressly forbid* such an elimination for retirees who, like the Plaintiffs, have already satisfied the pre-amendment conditions for qualifying for the subsidy. ERISA § 204(g) (quoted *supra*, note 8); I.R.C. § 411(d)(6). Even if Defendants were not required to apply the section 1139 rate to determine the present value of the subsidized portion of Plaintiffs' benefits, it does not follow that Defendants were permitted to eliminate the subsidized portion altogether.

Defendants maintain that the anti-cutback rules serve only to protect the total, present value of the amount to be distributed. They compare the total pre-amendment value, determined by applying the Moody's rate to the subsidized benefit, with the post-amendment value, which they determine by applying the section 1139 rate to the unsubsidized benefit. Because they offer the retirees the larger of these two figures, they conclude that there was no cutback on benefits.

This reasoning, however, ignores the plain command of the anti-cutback rules. Defen-

---

**8.** Section 204(g) provides:
(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan
. . . .
(2) For purposes of paragraph (1), a plan amendment which has the effect of—
(A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in the regulations), or

(B) eliminating an optional form of benefit, with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy.
I.R.C. § 411(d)(6) is substantially similar.

dants' determination of the post-amendment value of Plaintiffs' benefits constitutes an elimination of early retirement subsidies for retirees that have already satisfied the pre-amendment conditions for qualifying for the subsidies. Such an elimination is expressly forbidden. That Plaintiffs receive no less than the amount they would have gotten pre-amendment is irrelevant.

Moreover, as the district court pointed out and as Defendants readily admit, Congress enacted the REA and the TRA contemplating that retirees in Plaintiffs' position would enjoy increased benefits; the REA protected subsidies for which Plaintiffs already qualified, and the TRA provided that the present value of Plaintiffs' benefits is to be determined at the section 1139 rate. Plaintiffs were entitled by law to *both* the subsidies and the application of the section 1139 rate. Under the circumstances, given that Plaintiffs were entitled to an *increase* in the total present value of their lump sum distributions, it was not enough for Defendants merely to ensure that Plaintiffs' total distributions did not decrease. Defendants' response of cutting the subsidy as a means of keeping many of the retirees' benefits the same was an improper attempt to circumvent the results intended by Congress.

■ In support of their argument, Defendants cite to Rev.Rul. 81–12, 1981–1 C.B. 228 (1981). This ruling explains that the anti-cutback rules do not prohibit a change in the actuarial basis used to determine early retirement benefits so long as the change does not decrease any participant's accrued benefit. For example, according to the Ruling, a plan may increase the interest rate used to determine early retirement benefits so long as the plan also includes some method to preclude a resulting decrease in total benefit. However, the present issue involves, not a mere change in actuarial basis, but the complete elimination of accrued early retirement subsidies. Thus, the Ruling is not applicable to the present issue. Nothing in it comes close to suggesting that Defendants are allowed to entirely eliminate accrued early retirement subsidies. Besides, if an IRS ruling were to allow such an elimination, it would be contrary to the express language of the anti-

cutback rules as revised by the REA, and so the ruling would be invalid.

Defendants also rely on the REA Senate Report, which states: "If the [anti-cutback rule] protection is afforded, an employee's accrued benefit *is not to be less than the protected level* or the accrued benefit determined under the plan without regard to the protection, whichever is greater." TRW Br. at 23 (quoting S.Rep. No. 575, 98th Cong., 2d Sess. 28 (Aug. 1984) U.S.Code Cong. & Admin.News pp. 2547, 2574. (emphasis added by Defendants). The quoted passage is from a paragraph of the Senate Report which explains that the anti-cutback rule does not protect participants who do not qualify for a subsidy at the time of a plan amendment. In context, the purpose of the passage was to contrast the lack of protection afforded non-qualifying participants with the protection afforded qualifying participants. Nothing in the passage comes close to suggesting that a plan amendment can eliminate a subsidy for participants who already qualified for the subsidy pre-amendment. Further, even if the Senate Report did make such a suggestion, it would contradict the plain meaning of the statute that it purports to explain, and so would not lend persuasive support to Defendants' position.

Therefore, we affirm the district court's holding that Defendants' 1986 Plan amendment violated the anti-cutback rules by eliminating a subsidy for which Plaintiffs already qualified.

**B**

■ We return now to Defendants' argument that the interest rates established in section 1139 apply only to determine the present value of the retirees' "accrued benefits," which, by definition, include only the unsubsidized portion of the benefits. If Defendants are correct, then the district court erred by ordering that they calculate the present value of the subsidized portion of Plaintiffs' benefits using the section 1139 interest rate.

Plaintiffs respond to Defendants' argument by pointing out that a key Treasury Department regulation clearly states that the sec-

tion 1139 rate applies to determine the value of a subsidized early retirement benefit. Costantino Reply Br. at 16 (citing Treas.Reg. § 1.411(a)–11(a)(2) (1988)).[9] We agree with Plaintiffs that this regulation is dispositive of the question before us. Under section 1.411(a)–11(a)(1), Defendants may not distribute Plaintiffs' benefits without complying with the valuation rule of section 1.411(a)–11(a)(2). This valuation rule expressly requires that, where a plan provides that a lump sum distribution of a subsidized early retirement benefit is available as an option, the section 1139 interest rate must be applied to calculate the value of the distribution.

Defendants respond that, as of the 1986 Plan amendment, their Plan no longer offered the optional lump sum distribution of a subsidized early retirement benefit. Thus, they argue, section 1.411(a)–11(a)(2) does not require the section 1139 rate to be applied to subsidized benefits under the post-amendment Plan. While this conclusion about the post-amendment Plan is true, it is not relevant in the present case, in which Plaintiffs qualified for their subsidies prior to the 1986 Plan amendment. As we explained in the previous section, Defendants were not permitted to cut back the subsidized benefits for

which Plaintiffs qualified pre-amendment. Consequently, section 1.411(a)–11(a)(2) applies to Defendants' *pre-amendment* Plan in the present case.

Defendants argue that section 1.411(a)–11(a)(2) is an anomaly that "cannot be interpreted to overturn a definition of accrued benefit that has been developed by statute, legislative history, case law and regulation since the passage of ERISA." Defendants' Reply Brief at 11 (citing I.R.C. §§ 411(a)(7) and 411(c)(3); Treas.Reg. §§ 1.411(a)–7(a)(1) and 1.411(a)–7(c)(6) example 1; ERISA legislative history from the year 1974; and a series of cases construing the pre-REA anti-cutback rules). This argument ignores the fact that, unlike many of the sources cited by Defendant, section 1.411(a)–11(a)(2) does not purport to *define* the term, "accrued benefit." Rather, for the sole purpose of limiting an employer's ability to distribute benefits without appropriately calculating the value of any subsidies the employer offers, the section *treats* subsidized benefits as if they were accrued benefits. There is no inconsistency between Defendant's claim that the *definition* of "accrued benefits" excludes subsidies,[10] and the REA's strategy of protecting

---

9. Section 1.411(a)–11 provides in relevant part: (a) *Scope*–(1) *In general....* [I.R.C.] Section 411(a)(11) ... restricts the ability of defined benefit plans to distribute any portion of a participant's accrued benefit in optional forms of benefit without complying with specified valuation rules for determining the amount of the distribution....
(2) *Accrued benefit.* For purposes of this section, an accrued benefit is valued taking into consideration the particular optional form in which the benefit is to be distributed. The value of an accrued benefit is the present value of the benefit in the distribution form determined under the plan. For example, a plan that provides a subsidized early retirement annuity benefit may specify that the optional single sum distribution form of benefit available at early retirement age is the present value of the subsidized early retirement annuity benefit. In this case, the subsidized early retirement annuity benefit must be used to apply the valuation requirements of this section and the resulting amount of the single sum distribution. However, if a plan that provides a subsidized early retirement annuity benefit specifies that the single sum distribution benefit available at early retirement age is the present value of the normal retirement annuity benefit, then the normal retirement annuity benefit is used to

apply the valuation requirements of this section and the resulting amount of the single sum distribution available at early retirement age.

10. We do not here determine whether Defendants have correctly understood the definition of "accrued benefit." Prior to the REA, although the anti-cutback rules clearly provided that a plan could not decrease accrued benefits, the question of whether an employer was permitted to amend a plan governed by ERISA so as to reduce or eliminate early retirement subsidies was a controversy that split the federal circuit courts. *See Tilley v. Mead,* 927 F.2d 756, 760 (4th Cir.1991) (construing pre-REA plan, holding that subsidies were not protected), *cert. denied,* ⸻ U.S. ⸻, 112 S.Ct. 3013, 120 L.Ed.2d 886 (1992); *Amato v. Western Union Int'l Inc.,* 773 F.2d 1402 (2d Cir.1985), *cert. dismissed,* 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986) (holding that subsidies were protected); *Bencivenga v. Western Penn. Teamsters & Employers Pension Fund,* 763 F.2d 574 (3d Cir.1985) (holding that subsidies were not protected); *Sutton v. Weirton Steel Div. of Nat'l Steel Corp.,* 724 F.2d 406 (4th Cir.1983), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984) (same). The controversy apparently still continues when courts are faced with the task of construing the

subsidies by *treating* them as "accrued benefits" in several provisions. *See, e.g.,* ERISA § 204(g); I.R.C. § 411(d)(6). Far from being an anomaly, section 1.411(a)–11(a)(2) is an integral part of REA's strategy; indeed, if this section did not exist, there would be an anomalous lack of guidance regarding how to calculate the present value of optional early retirement subsidies.

Similarly, Defendants maintain that section 1.411(a)–11(a)(2) (enacted in 1988, but retroactively effective as of January 1, 1985) ought not to have retroactive effect over the 1986 Plan amendment. They argue that this section constitutes a restrictive and radical departure from the treatment of accrued benefits prior to 1988, and IRS Notice 87–20, 1987–1 C.B. 456 (1987), promised that "[i]f further guidance is more restrictive than the guidance provided by this notice, such further guidance will not have retroactive effect." TRW Reply Br. at 16. Because we regard section 1.411(a)–11(a)(2) as a reasonable clarification of the REA's scheme for protecting subsidies, which is neither more restrictive than nor a radical departure from the state of the law prior to the section's enactment, we see no reason to deny the section the retroactive effect that the Treasury Department intended it to have.

Thus, the district court did not err in ordering TRW to calculate the present value of Plaintiffs' lump sum distributions, including the subsidized portion of Plaintiffs' benefits, by applying the section 1139 interest rates.

---

**IV.** *Defendants Must Use Either the PBGC Rate That Was in Effect at the Beginning of the Year or the PBGC Rate Rate That Was In Effect at the Time of Distribution, Whichever Rate Results in the Larger Benefit*

The district court ruled that the rate to be used in calculating the lump-sum distributions should be the PBGC rate in effect on the date that the distribution occurred. The court acknowledged that temporary Treasury Regulations enacted in 1985 specifically permitted a plan to choose between using the rate at the beginning of the year and the rate at the time of distribution, but the court deferred to a 1987 IRS Notice that required the latter rate. J.A. at 58–59.[11]

■ We agree with Defendants that the district court's reliance on Notice 87–20 was misplaced. As Defendants point out, in REA's legislative history, the Senate Finance Committee expressly intended that "the PBGC rate in effect at the beginning of a plan year may be used throughout the plan year if the plan so provides." S.Rep. No. 575, 98th Cong., 2d Sess. 24 (1984). U.S.Code Cong. & Admin.News pp. 2547, 2570. Consequently, the temporary Treasury Department regulations issued under the REA in 1985, and the permanent regulations issued in 1988 (retroactively effective as of January 1, 1985) both provide that a plan may use either the interest rate in effect at the time of distribution or the rate in effect at the beginning of the plan year. Temp. Treas.Reg. § 1.417(e)–1T(b)(2)(ii) (1985); Treas.Reg. § 1.417(e)–1(f) (1993). In light of

---

pre-REA anti-cutback rules. *See Tilley,* 927 F.2d at 761 n. 3 (noting that it is not clear whether REA changed or merely clarified Congress's original intent regarding ERISA and early retirement benefits); *Ashenbaugh v. Crucible Inc., 1975 Salaried Retirement Plan,* 854 F.2d 1516, 1526 (3d Cir. 1988), *cert. denied,* 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1019 (1989) (describing split between circuits); Dana M. Muir, Note, *Changing the Rules of the Game: Pension Plan Terminations and Early Retirement Benefits,* 87 Mich.L.Rev. 1034, 1040–46 (1989) (same). However, all of the circuits apparently agree that the REA revisions of the anti-cutback rules settled the matter for plan amendments subsequent to December 31, 1984. *See Tilley,* 927 F.2d at 761 n. 3; *Ashenbaugh,* 854 F.2d at 1527; *Amato,* 773 F.2d at 1412; *Bencivenga,* 763

F.2d at 577; *Muir, supra,* at 1035 n. 8. Although the court below expressly held that early retirement subsidies are not accrued benefits, we express no opinion as to the correctness of this holding.

**11.** According to IRS Notice 87–20:

> For purposes of recalculating the amount of the benefit, if the date the benefits commenced precedes the first day of the first plan year beginning after December 31, 1986, the date for the determination of the "applicable interest rate" (and 120% of that rate, as appropriate) shall be the date the benefits commenced.

Because Plaintiffs all received their benefits before December 31, 1986, the district court held that Defendants should have used the rate set by the PBGC on the date the benefits commenced.

these regulations, the court's deference to the IRS Notice was inappropriate. Unlike the regulations, IRS rulings do not have the force of law and are merely persuasive authority. *Threlkeld v. Commissioner*, 848 F.2d 81, 84 (6th Cir.1988); *Byrum v. United States*, 440 F.2d 949, 952 (6th Cir.1971), *aff'd*, 408 U.S. 125, 92 S.Ct. 2382, 33 L.Ed.2d 238 (1972). *Threlkind* expressly holds that "[a] Revenue Ruling is not entitled to the deference accorded a ... Treasury Regulation." 848 F.2d at 84.

 It does not follow, however, that Defendants are correct in claiming that their choice to use the beginning-of-the-year rate was entirely within their discretion. As Plaintiffs point out, Treasury Regulation § 1.417(e)–1(d)(3)(iv) removes any discretion that Defendants may have otherwise had with regard to the interest rate Defendants are permitted to apply to Plaintiffs' benefits.[12] Under this regulation, when a plan amendment changes the time for determining the section 1139 interest rate, it must use the time that will result in the larger benefit.

In the present case, Defendants' 1986 Plan amendment certainly changed the time for determining the applicable interest rate.

Pre-amendment, the Plan applied "the Moody's interest rate in effect during the first month of the calendar quarter preceding the calendar quarter in which distribution was made." TRW Br. at 17. Post-amendment, the Plan applied the section 1139 rate in effect at the beginning of the year of the distribution.

Defendants argue that section 1.417(e)–1(d)(3)(iv) is inapposite to their 1986 Plan amendment, because this amendment initiated the use of the section 1139 rate rather than changing a prior use of the rate. This argument has no merit. The section applies to any plan amendment that "changes the time for determining" the section 1139 rate. The 1986 amendment did two things that are relevant here: (1) it initiated the use of the section 1139 rate; and (2) it determined this new rate at a different time than the pre-amendment plan determined its old rate. Clearly, these two things together constitute a change in the time for determining the section 1139 rate, and so the section is dispositive of the present issue.[13]

Due to the district court's reliance on IRS Notice 87–20, the court concluded that, in recalculating the present value of Plaintiffs'

---

**12.** Section 1.417(e)–1(d)(3)(iv) provides in relevant part:

> If a plan amendment changes the time for determining the section 417 interest rate, the amendment will not be treated as reducing an accrued benefit if the conditions of this subdivision (iv) are satisfied.... If the plan amendment is adopted retroactively (that is, the plan amendment is effective prior to the adoption date), the plan must use the rate resulting in the larger accrued benefit for the period beginning with the effective date and ending one year after the adoption date.

The "section 417 interest rate" to which the provision refers is simply another name for the section 1139 rate. *See* Treas.Reg. § 1.417(e)–1(d)(2). The provision clearly implies that, if a plan amendment changes the time for determining the interest rate, and does not satisfy the conditions of the subdivision, the amendment will be treated as reducing an accrued benefit. Such an amendment would violate the anti-cutback rules of ERISA § 204(g) and I.R.C. § 411(d)(6).

**13.** Defendants also argue that Plaintiffs did not cite or rely on section 1.417(e)–1(d)(3)(iv) in the court below, characterizing Plaintiffs' argument on appeal as a "new theory." We agree with Defendants that, in general, this court will not

consider a theory of recovery that was not presented to the court below, but was rather raised for the first time only on appeal. However, we do not agree with Defendants' characterization of Plaintiffs' argument as a new theory of recovery. To the contrary, Plaintiffs' theory of recovery remains unchanged; the only change is that Plaintiffs are now citing to statutory authority in support of their theory to which they apparently did not cite in the court below.

In effect, Defendants are urging us to adopt a rule prohibiting parties from submitting new citations of authority at the appellate level. Such a rule would undermine one of the fundamental purposes of our adversarial legal system, that of determining the legal premises properly applicable to a case. MODEL RULES OF PROFESSIONAL CONDUCT, Comment to Rule 3.3(a)(3). To this end, a new citation to relevant, binding authority is as welcome on appeal as in the court below. Indeed, considering that section 1.417(e)–1(d)(3)(iv) is binding authority, dispositive of the issue before us, Defendants themselves would have been affirmatively obliged to bring this section to our attention upon learning of its existence, had Plaintiffs not already done so. *See, e.g.,* MODEL CODE OF PROFESSIONAL RESPONSIBILITY DR 7–106(B)(1); MODEL RULES OF PROFESSIONAL CONDUCT Rule 3.3(a)(3).

lump sum distributions, Defendants must use the section 1139 interest rate that was in effect at the time the distributions occurred. In light of section 1.417(e)–1(d)(3)(iv), and because a lower interest rate results in a larger lump sum benefit, the district court's conclusion will turn out to be correct whenever the interest rate in effect at the time of distribution is lower than that in effect at the beginning of the year, but will turn out to be incorrect whenever the interest rate in effect at the time of distribution is higher than that in effect at the beginning of the year. Therefore, we direct the district court to modify its order so that the present value of Plaintiffs' lump sum distributions in excess of $25,000, (using the PBGC rate), shall be calculated by using an interest rate that is 120% of the PBGC rate in effect at *either: (a) the beginning of the year, or (b) the time the distribution occurred,* whichever rate would result in a greater total benefit.

### Conclusion

In light of the foregoing, and except for the modification to the district court's order that is indicated above, we AFFIRM the opinion of the district court and REMAND for further proceedings in accordance with this opinion.