**Kim RAMSEY and Adam Kollar, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**AMFAC, INC., Northbrook Corporation, et al., Defendants.**

No. C 95–4317–CAL.

United States District Court,
N.D. California.

March 12, 1997.

1425

Mark M. Garay, Matthew J. Cooney, Mark M. Garay Law Offices, San Francisco, Bradley J. Schram, Hertz Schram & Saretsky, Bloomfield, MI, Allen C. Engerman, Allen C. Engerman Law Offices, Northbrook, IL, for plaintiffs.

Susan W. Ansberry, Folger & Levin, San Francisco, for Defendants.

## ORDER ON MOTIONS

LEGGE, District Judge.

This class action concerns competing claims to money held in a single-employer, defined-benefit, employee pension plan that defendants terminated on December 31, 1994. The dispute arises from conflicting interpretations of the effect of the Retirement Protection Act of 1994 ("RPA"), Pub.L. No. 103–465, 108 Stat. 5012 (1994), on the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* This court has subject matter jurisdiction over this dispute under 29 U.S.C. section 1132(e)(1) and 28 U.S.C. section 1331. Plaintiffs move for judgment on the pleadings on Count I, and defendant Northbrook cross-moves for summary judgment on Count I.

### I

The record of the motions and the pleadings establish the following facts without dispute:

Defendant Amfac created an employee benefit plan in 1989 by merging twelve previously established subplans into one. Since December 1992, defendant Northbrook has administered the plan.[1] At all relevant times, the plan has provided that Northbrook

1. Northbrook is the only defendant that has been served with the complaint and the only defendant that appeared in opposition to plaintiffs' motion.

would receive 100% of any reversion and that Northbrook retained full authority to amend or terminate the plan at any time. (Retirement Plan for Employees, Ex. A to Walich Dec., ¶ 14.01.) In October 1994, Northbrook notified the plan participants that the plan would terminate on December 31, 1994.

On December 8, 1994, President Clinton signed the RPA as part of the General Agreement on Tariffs and Trade ("GATT") legislation. The RPA authorizes pension plan administrators to calculate the present value of vested benefits according to the interest rate on 30–year U.S. Treasury securities rather than the rates set monthly by the Pension Benefit Guaranty Corporation ("PBGC").[2] The rate set by the RPA is higher than the rates previously used.

Before terminating the plan, Northbrook amended the plan to use the interest rate authorized by the RPA when calculating the present value of benefits. Because Northbrook had previously used a lower interest rate, the amendment reduced the present value of plaintiffs' vested future benefits and increased the portion of the plan's assets that reverted to Northbrook following termination. According to plaintiffs, approximately $5 million of Northbrook's total reversion would have been distributed to the plan beneficiaries if not for the amendment.

## II.

Plaintiffs filed this action on December 1, 1995 and filed their first amended complaint on April 12, 1996. Plaintiffs allege that Northbrook breached its fiduciary duties under ERISA sections 403(c)(1) and 404(a)(1) and 29 U.S.C. sections 1103(c)(1) and 1104(a)(1) by adopting and implementing the RPA amendment. There are two classes of plaintiffs involved in this action. Count I of the complaint affects *only* those people who received a lump sum payment or distribution following termination of the plan (the "GATT class"), and alleges violations of sections 4044(d)(2)(A) and 401(c)(1) of ERISA. Count II, alleging violation of section 404(a)(1) of

ERISA, is not at issue in these motions. It affects those people who participated and were vested in a cash balance subplan of the plan (the "Cash Balance Class"). The court refers to the GATT class as the "plaintiffs" for the purpose of these motions and this order.

In these motions on Count I, plaintiffs claim that Northbrook violated ERISA section 4044(d)(2)(A), 29 U.S.C. § 1344(d)(2)(A), by treating the December 1994 amendment on interest rates as effective before the end of the fifth calendar year following the date Northbrook adopted the amendment. Northbrook asserts that the immediate adoption of the RPA interest rates was consistent with the RPA and section 4044(d)(2)(A), and that Northbrook therefore distributed the plan's assets in accordance with the terms of a lawfully amended plan. Northbrook argues that Congress specifically authorized it to employ the RPA actuarial assumptions immediately.

■■■■ Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed. R.Civ.P. 12(c). A plaintiff as well as a defendant may bring a motion under 12(c). *Moran v. Peralta Community College Dist.*, 825 F.Supp. 891, 893 (N.D.Cal.1993). Judgment under Rule 12(c) is proper "when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios v. Richard Feiner and Co.*, 896 F.2d 1542, 1550 (9th Cir.1989).

Summary judgment should be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of "informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

**2.** The PBGC is a self-financing government corporation charged with guaranteeing the payment of certain benefits in terminated defined benefit plans. The PBGC provides a floor of benefit

protection for participants and beneficiaries in pension plans that terminate without sufficient assets to pay full promised benefits.

with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

No material facts are in dispute in these motions. The motions present issues of law appropriate for decision on the present record.

### III.

Plaintiffs make two arguments: First, they argue that Northbrook adopted and implemented the RPA amendment in violation of ERISA section 4044(d)(2)(A) because it did not wait five years before making the amendment effective. Second, plaintiffs argue that Northbrook's distributions of plan assets upon termination contravened various provisions of law and therefore violated ERISA section 403(c)(1). Northbrook disagrees with both arguments and contends that its contrary interpretations are correct as a matter of law.

#### A. *ERISA's Five Year Rule*

##### 1. *Statutory Language*

In 1987, Congress enacted the Pension Protection Act ("PPA"), Pub.L. No. 100–203, 101 Stat. 1330–333 (1987), amending various sections of ERISA. The PPA added a new subparagraph (2) to ERISA section 4044(d) which provides in relevant part that:

In determining the extent to which a plan provides for the distribution of plan assets to the employer ... any such provision, and *any amendment increasing the amount which may be distributed to the employer, shall not be treated as effective before the end of the fifth calendar year following the date of the adoption* of such provision or amendment.

29 U.S.C. § 1344(d)(2)(A) (emphasis added).

##### 2. *Purposes of the PPA*

Among the stated goals of the PPA were (a) improving benefit security by revising plan termination rules to increase the likelihood that participants and their beneficiaries will receive promised benefits, and (b) decreasing the likelihood that employers who desire access to surplus plan assets will prematurely terminate plans. H. Rep. No. 100–391(1) at 103 (1987) U.S.Code Cong. & Admin.News 1, 77.

Congress adopted the five year rule

to stop the practice that has flourished under current law of employers amending their plans immediately prior to plan termination to permit the employer to recover residual assets. This practice both led to an increase in plan terminations and defeated the reasonable expectations of plan participants with respect to the amounts they would receive from their plan.

*Id.* at 132, U.S.Code Cong. & Admin.News p. 106–107.

#### B. *RPA's Amendment of the Applicable Interest Rate*

##### 1. *Statutory Language*

The RPA amended ERISA sections 203(e) and 205(g)(3) and the corresponding sections of the Internal Revenue Code ("IRC"), sections 411(a)(11) and 417(e)(3), to provide that the applicable interest rate to determine the present value of benefits would be the 30–year Treasury rates rather than the monthly rates set by the PBGC.

Congress expressly provided that "an employer may treat the amendments [to ERISA and the IRC] made by this section as being effective on or after the date of the enactment of this Act." RPA § 767(d)(1). Northbrook argues that Congress intended that plans be able to incorporate the new actuarial assumptions immediately, rather than waiting the five years required by section 4044(d)(2)(A).

ERISA section 204(g), 29 U.S.C. § 1054(g), and its IRC analogue, section 411(d)(6), 26 U.S.C. § 411(d)(6), are commonly referred to as the "anti-cutback" rules. They generally prohibit plan amendments that diminish accrued benefits. In order to avoid conflict with the anti-cutback rules, the RPA explicitly waived any violation of these rules caused by the adoption of the RPA interest rates. The RPA provides that: "[a] participant's accrued benefit shall not be considered to be reduced in violation of section 411(d)(6) of the [IRC] ... or section 204(g) of [ERISA]

merely because . . . the benefit is determined [according to the new interest rates]. . . ." RPA § 767(d)(2). But the RPA did not expressly exempt the application of section 4044, which contains the five year waiting period.

### 2. Purposes of the RPA

The new rates established by Congress were higher than the old rates, allowing plan administrators to more easily cover the future obligations of defined benefit plans by the existing assets. One of Congress's primary purposes in changing the interest rates was to reduce the potential exposure of the PBGC, which partially reimburses members of insured plans that terminate without sufficient assets to cover vested benefits.

### 3. Importance of Congress's Exemption of the RPA Interest Rates from the Anti–Cutback Rules

The parties offer conflicting characterizations of Congress's exemption of the RPA interest rates from the anti-cutback rules. Northbrook interprets the exemption to mean that Congress intended generally that the adoption of the RPA rates should not be considered a reduction in benefits. Plaintiffs argue that because Congress exempted the effect of the RPA from the anti-cutback rules, but not from the five-year rule of section 4044(d)(2)(A), Congress must have intended that the five-year rule continue to apply even in situations affected by the RPA. One such situation is where a terminating plan adopts the new interest rates just before termination, thereby increasing the amount of the employer's reversion. Although the RPA amended or enacted over a dozen ERISA sections, Congress did not amend section 4044 when it enacted the RPA. Nothing in the RPA's legislative history suggests that Congress intended to waive the five-year rule.

### C. Types of Amendments Covered by section 4044(d)(2)(A)

■ Plaintiffs argue that because Northbrook's amendment increased the amount of the reversion by approximately $5 million, the amendment is governed by the five-year rule of section 4044(d)(2)(A) and was there-

fore ineffective on the date the plan was terminated.

Northbrook argues that section 4044(d)(2)(A) governs only those amendments that either provide a new right of reversion, or increase the percentage of surplus assets that will revert to the employer upon plan termination. Here, because the employer was already entitled to 100% of any excess plan assets after termination, Northbrook argues that the amendment did not increase the amount of the reversion, but that it merely had "an incidental effect on the amount of the employer's reversion." (Def's Mem. of Pts. & Auth. in Opp. at 15.) Northbrook apparently draws a distinction between an amendment that "increas[es] the amount which may be distributed to the employer," 29 U.S.C. § 1344(d)(2)(A), and an amendment that "has the effect of increasing" the amount of the employer's reversion. Northbrook further argues that section 4044(d)(2)(A) was not intended to impair the adoption or implementation of amendments that change a plan's benefit accrual or calculation provisions.

■ This case demonstrates that amendments that alter benefit accrual or calculation provisions, based on changes in interest rates, can have the same impact on the distribution of plan assets as do amendments altering the percentage of surplus assets that revert to the employer upon termination. Northbrook's interpretation would allow plan administrators to evade the five-year rule by recasting pre-termination amendments as adjustments of benefit calculation provisions. Northbrook's arguments are not consistent with the protective provisions of ERISA generally or with section 4044 specifically. Where the parties present alternative readings of a statute, the court "must examine the meaning of an enactment to see whether one construction makes more sense than another as a means of attributing a rational purpose to the enacting authority." *Security Pacific Nat'l Bank v. Resolution Trust Corp.*, 63 F.3d 900, 905 (9th Cir.1995).

### D. Does Plaintiffs' Interpretation of section 4044 Render the RPA a Nullity?

■ Northbrook argues that plaintiffs' position voids the explicit instruction in the

RPA that the new interest rates are to be immediately effective. This court concludes that no conflict exists between section 4044(d)(2)(A) and the RPA. Section 4044(d)(2)(A) applies when an overfunded plan confers a reversion to an employer. Under the RPA, plan administrators may immediately amend their plans to adopt the new interest rate. If the plan is underfunded (the primary target of the RPA), no surplus money reverts to the employer, the amendment will therefore not *increase* the employer's reversion, and will not implicate section 4044(d)(2)(A). If, however, the plan is overfunded, the chief beneficiary of the interest rate amendment is the holder of the reversionary interest rather than the plan participants. Where the employer holds all or part of that reversionary interest, section 4044(d)(2)(A) *does* apply. The RPA applies differently between under- and overfunded plans. Such a distinction is reasonable in light of the purposes of the RPA.

Plaintiffs admit that the RPA expressly allows plan administrators of non-terminating plans to use the new actuarial assumptions when calculating benefits, such as those paid to a retiring employee. Northbrook contends that this creates an unwarranted distinction between terminating and non-terminating plans. But this is reasonable, because only a terminating plan can have a "reversion" that implicates section 4044(d)(2)(A). This distinction could lead to some seemingly inconsistent results. For example, an overfunded, non-terminating plan can distribute benefits under the RPA interest rates to a retiring participant, but the participant may be entitled to a recalculation of benefits if the plan terminates within five years of adopting the new rates. (*See* Reply Mem. of Pts. & Auth. in Supp. of Def.'s Motion for Summ. Judgment at 7.) The language of the five year rule, however, indicates that when Congress passed section 4044(d)(2), it was less concerned with regulating the benefits paid to individual plan participants than with regulating the employer's ability to acquire a large reversion interest. The examples to which Northbrook cites to undermine plaintiffs' interpretation demonstrate only that the PPA is not focused on guaranteeing a certain level of *benefits,*

but on preventing overreaching by employers and plan administrators.

This court can find no principled basis to agree with Northbrook's assertion that Congress enacted section 4044(d)(2)(A) to regulate only those amendments that create *new* rights of reversion in an employer or increase the employer's *percentage* of reversion, rather than to regulate amendments that have the effect of increasing "the amount which may be distributed to an employer." The court therefore adopts plaintiffs' interpretation of section 4044(d)(2)(A) and its relationship to the RPA.

### E. *Requirement that Plan Assets Inure to Benefit of Employees under ERISA section 403(c)(1)*

The second argument is founded on ERISA section 403(c)(1), which provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). The section provides an exception for distributions made in accordance with ERISA section 4044, but plaintiffs argue that the distributions at issue in this case violate both section 4044(d)(2)(A), as discussed above, and section 4044(d)(1)(B).

Section 4044(d)(1)(B) provides that any residual assets of a single-employer plan may be distributed to the employer if, among other things, "the distribution does not contravene any provision of law." 29 U.S.C. § 1344(d)(1)(B). Plaintiffs contend that the distributions here violated two separate provisions of law. First, as discussed above, they assert that Northbrook violated section 4044(d)(2)(A) by calculating the distributions based on the RPA interest rates less than five years after the plan amendment. Second, plaintiffs assert that the distributions violated the exclusive benefit rule of IRC section 401(a)(2), which requires that the trust instrument make it "impossible, at any time prior to the satisfaction of all liabilities ... for any part of the corpus or income to be ... used for, or diverted to, purposes

other than for the exclusive benefit of the employees or their beneficiaries." 26 U.S.C. § 401(a)(2).

The Treasury regulations interpret the exclusive benefit rule to allow distribution of surplus assets to an employer only if the surplus results from "erroneous actuarial computation." T.R. 1.401–2. A hypothetical in the regulations explains that if a surplus accumulates "as a result of a change in the benefit provisions or in the eligibility requirements of the plan, the [surplus] could not revert to the employer because such surplus would not be the result of erroneous actuarial computation." T.R. 1.401–2(b)(1). Plaintiffs argue that Northbrook's adoption of the RPA amendment was not erroneous actuarial computation and that Northbrook has therefore violated section 401(a)(2) by adopting the RPA amendment and distributing the disputed plan assets to itself.

In support of their position, plaintiffs cite an internal IRS memorandum that says:

> Any increase in the reversion of plan assets to the employer that is attributable to a plan amendment applying the new GATT interest and mortality assumptions is not considered to be the result of erroneous actuarial computation within the meaning of § 1.401–2 of the [IRS] regulations. Therefore, a plan amendment causing such an increase could violate section 401(a)(2).

(IRS Memo., June 23, 1995, Ex. C to Pl.'s Mem. of Pts. & Auth. in Opp. at 3.)

Northbrook argues that I.R.S. Revenue Rulings are "merely persuasive authority," *Costantino v. TRW, Inc.,* 13 F.3d 969, 981 (6th Cir.1994), and that internal I.R.S. memoranda do not reflect final or even proposed regulations and therefore deserve even less deference from this court. Further, the I.R.S. memorandum does not describe the conditions under which an amendment "could" violate section 401(a)(2). Although the memorandum directly supports plaintiffs' contentions, it does not provide sufficient authority for this court to hold that Northbrook has violated section 401(a)(2).

### F. *Satisfaction of all liabilities*

Once all liabilities of a plan have been satisfied, ERISA section 4044(d)(1) entitles an employer to recoup any excess assets remaining in the plan, as long as the plan provides for the reversion and the reversion does not otherwise violate any federal law. 29 U.S.C. § 1344(d)(1).

Northbrook contends that it had satisfied all plan liabilities before recouping the surplus and therefore it had a right to recover any surplus under the terms of the plan. Plaintiffs correctly argue that the RPA amendment should not have taken effect as to this plan until 1999, and that any distributions under the plan should have occurred subject to the previous interest rates. Northbrook was therefore obligated to base distributions to the plan participants on the old rates, at least until the RPA amendment became effective as to this plan. Because Northbrook made payments according to the RPA interest rates, it did not satisfy all of its liabilities under the plan before recouping the resulting surplus assets. The amount in dispute in Count I is a liability of the plan to the plan participants, not a surplus due to overfunding. Northbrook has not satisfied all of its liabilities under the plan.

### IV.

Congress has provided little guidance to help resolve the parties' conflicting interpretations. In the absence of any indication that, despite section 4044(d)(2)(A), Congress intended that an employer should be permitted to amend its plan to increase the amount of its reversion without waiting five years for such an amendment to take effect, this court must accept plaintiffs' interpretation of the interplay between the RPA and ERISA section 4044(d)(2)(A). This court finds that Northbrook has violated ERISA section 4044(d)(2)(A). Accordingly, the court GRANTS plaintiffs' motion for judgment on the pleadings on Count I and DENIES Northbrook's motion for summary judgment on Count I.

### V.

Plaintiffs request a judgment jointly and severally against all defendants requiring

payment to the GATT class of an amount equal to the increase in the reversion resulting from the amendment. Plaintiffs also request reasonable attorneys' fees under ERISA section 502(g), 29 U.S.C. § 1132(g), costs, and interest. Northbrook argues that the proper remedy is a proportional allocation of any improper reversion among all of the participants and beneficiaries of the plan, including those who did not receive a lump sum distribution.

This court will address the appropriate remedy for a violation of section 4044(d)(2)(A), including the appropriateness of interest, costs, attorneys' fees, and joint and several liability, in supplemental proceedings. At that time, the court will also address Count II of plaintiffs' complaint. A status conference will be held on April 11, 1997, at 11:00 A.M., to schedule those further proceedings.

IT IS SO ORDERED.