**Kenneth KIEFER and Michael Doyle, on behalf of themselves and all others similarly situated, Plaintiffs,**

**v.**

**CERIDIAN CORPORATION, a Delaware Corporation, Ceridian Corporation Retirement Plan, Service Bureau Corporation, Computing Devices ∙ International Corporation, and Empros Systems International Corporation, SBC Retirement Plan, Computing Devices International Retirement Plan, Empros Systems International Retirement Plan, Defendants.**

**Civ. No. 3–95–818 (RHK/FLN).**

United States District Court, D. Minnesota, Third Division.

May 5, 1997.

Order Denying Modification June 2, 1997.

Arthur T. Susman and Charles R. Watkins, Susman, Buehler & Watkins, Chicago, IL, Karl L. Cambronne, Chestnut & Brooks, Minneapolis, MN, and Allen C. Engerman, Engerman Law Office, Northbrook, Illinois, for Plaintiffs.

Steven J. Olson and Ann M. Curme, Ceridian Corporation, Minneapolis, MN, James D. Holzhauer and Charles F. Regan, Mayer, Brown & Platt, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Plaintiffs Kenneth Kiefer ("Kiefer") and Michael Doyle ("Doyle") brought this action on behalf of themselves and all others similarly situated (collectively "Plaintiffs"). Plaintiffs allege that the Defendants failed to pay a class of approximately 12,000 Ceridian Corporation retirees the proper lump-sum retirement benefits to which they were entitled under four, jointly administered, pension plans ("the Plans"). Plaintiffs assert causes of action for violations of the Employee Retirement Income Security Act ("ERISA"); breach of fiduciary duty; breach of contract; and conversion. Before the Court is Defendants Ceridian Corporation ("Ceridian") and Ceridian Corporation Retirement Plan's ("Ceridian Plan") Motion for Summary Judgment.[1] For the reasons set forth below, the

---

1. At the time this Motion was filed, Plaintiffs also brought a Motion to Strike Exhibit 2 to the

Court will grant the Motion in part and deny it in part.

## Factual Background

### I. The Parties and the Scope of Defendants' Motion

#### Relevant Defendants

Ceridian, the successor of Control Data Corporation ("CDC"), is a corporation primarily engaged in data processing. (*See* Pls.' Am. Compl. ¶ 6; Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. at 2 ("Pls.' Opp'n Mem.").) Formerly a substantial manufacturer of mainframe computers with 61,000 employees, by the early 1990s, CDC had restructured itself into a much smaller company. (*See* Hammond Aff. ¶¶ 4–5.) Today, Ceridian has approximately 10,700 employees and is a leading information services and defense electronics company, serving the human resources, electronic media, transportation, gaming, and government markets. (*Id.* ¶ 5.)

The Ceridian Plan, formerly known as the Control Data Corporation Retirement Plan, was created in the 1970s to provide retirement benefits for its participants. (Pls.' Opp'n Mem. at 2.) It is an employee pension benefit plan within the meaning of ERISA, 29 U.S.C. § 1002(2), which Ceridian maintains for the benefit of the current and former employees of Ceridian and CDC.[2] (Pls.' Am. Compl. ¶ 7.)

#### Plaintiffs

Kiefer worked for CDC for twenty-four years. (*See* Pls.' Opp'n Mem. at 3; Pls.' Am. Compl. ¶ 5(b).) In 1989, he was terminated as part of a downsizing effort. (*See* Kiefer Depo. 6:1–3.) Similarly, Doyle worked for CDC for twenty-four years and was terminated as part of CDC's downsizing. (*See* Doyle Depo. 6–7; Pls.' Opp'n Mem. at 3.)

Kiefer and Doyle represent a class of approximately 12,000 former employees of Ceridian and three related companies who participated in the Plans. (*See* Pls.' Opp'n Mem. at 3.) Plaintiffs allege that each class member received an erroneous lump sum benefit[3] from one of these four plans between 1990 and 1995. (*See id.*) Plaintiffs contend that one or more of four distinct payment miscalculations infected their lump sum benefits. (*Id.*) The instant Motion is addressed to the Ceridian Plan—one of the four Plans at issue—and involves one of four alleged miscalculations.

### II. The Structure of the Ceridian Plan & Governing Law

Employee pension plans are regulated under ERISA, 29 U.S.C. § 1001, et seq. For example, ERISA governs the way those plans may be maintained, requires certain employer contributions, and imposes fiduciary duties on the plan sponsors. *See* 29 U.S.C. § 1104(a); *Bigger v. American Commercial Lines*, 862 F.2d 1341, 1343–44 (8th Cir.1988). The Internal Revenue Code, 26 U.S.C. § 1, *et seq.*, governs the tax consequences of the pension plans, and the interest rates used to compute benefits.

The Ceridian Plan is a "defined benefit plan"; employees who work long enough earn a vested, non-forfeitable right to defined benefit options. (*See* Pls.' Opp'n Mem. at 3.) Under ERISA, vested benefits cannot be altered, reduced, or eliminated. 29 U.S.C. § 1054(g) ("The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an

December 17, 1996 Affidavit of Charles F. Regan, Jr., submitted with Defendants' Memorandum In Support of Their Motion for Summary Judgment. The parties resolved this matter and Plaintiffs have withdrawn this motion. (*See* Stipulation Regarding Pls.' Mot. to Strike, Doc. No. 79.)

Defendants have also appealed Magistrate Judge Noel's Order allowing Plaintiffs to Amend their Complaint. Because the Court's ruling on Summary Judgment may moot some of the issues presented by this appeal, the parties requested the Court defer its consideration until after ruling on the instant Motion. Thus, the Summary, Judgment Motion is the only matter before the court.

2. The Ceridian Plan is one of four related retirement plans ("the Plans") implicated in this case. Each of the Plans contains substantially similar relevant language. Ceridian is a fiduciary of all four of the Plans, and all four were commonly administered. (*See* Pls.' Opp'n Mem at 2–3 n. 1; Pls.' Am. Compl. ¶ 2.)

3. A lump sum benefit is a one-time payment of retirement benefits, taken in lieu of monthly payments. (*See* Pls.' Opp'n Mem. at 5–6.)

amendment described in section 1082(c)(8) or 1441 of this title.").

### Contributions

Under the Ceridian Plan, employees are required to make pre-tax contributions. While this pre-tax money is technically considered Ceridian's money, it comes out of the employees' pay-checks. (*See* Hammond Depo. 87:13–16 ("On a pre-tax basis, technically it's considered employer money. Now, employers and actuaries will probably have to explain why. To after-tax people, it is considered employee money."); Hammond Depo. 33:1–3 (noting that contributions are made by deductions from employee pay-checks); Moody Depo. 50:2–7.) Ceridian considered the money to be the employees'. (*See* Drabek Depo. 48–49 ("I remember that the company felt that this money was the employees' money.")). This was especially true since Ceridian itself had made little or no contribution to the Plan.[4] (Drabek Depo. 47:15–18 ("as I recall, the company probably hadn't had to make any contributions to the plan for a period of time because the employee contributions were supporting it ...")).

### Rates

Section 417(e) of the Internal Revenue Code governs the interest rates plans can use to calculate lump sum benefits. *See* I.R.C. § 417(e); *see also* 29 U.S.C. § 1055(g) (ERISA § 205(g)). In its original form, this section provided that, in calculating lump sums, plans should use "an interest rate not greater than the interest rate which would be used (as of the date of the distribution) by the Pension Benefit Guaranty Corporation for purposes of determining the present value of a lump sum distribution on plan termination." (Retirement Equity Act ("REA") of 1984, Pub.L. 98–397 § 203(e)(1) (Regan Aff., Ex. 10.).) In mid–1985, the Internal Revenue Service ("IRS") issued temporary regulations interpreting Section 417(e) to require plans to "use an interest rate not greater than the rate used by the Pension Benefit Guaranty Corporation ... to value immediate annuities for plans terminating...." ("the PBGC immediate rate")

(Temp.Treas.Reg. § 1.417(e)–1T(b)(2)(ii), 50 Fed.Reg. 29, 375 (1985), Regan Aff., Ex. 11).)

### The 1985 Plan and Lump Sum Distributions

The instant case focuses on lump sum distributions paid out from the 1989 version of the Plan ("the 1989 Plan"). The 1989 Plan is based on the 1985 version of the Plan ("the 1985 Plan"), thus, an examination of the 1985 Plan is necessary.

Under the 1985 Plan, vested participants could obtain a lump sum benefit only in the following circumstance:

> 5.14 *Payment of Small Amounts.* In the discretion of the Administrator, if the actuarially equivalent lump sum value of the benefit to which a Participant, his spouse or designated beneficiary or joint annuitant is entitled under the Plan is *Five Thousand Dollars or less,* payment of such benefit may be in the form of a lump sum; provided that, if such actuarially equivalent lump sum value is greater than Three Thousand Five Hundred Dollars, the Participant (with consent of his spouse) or such other person who is entitled to receive the benefit, as the case may be, must first request payment in that form.

(Pls.' Ex. C00078 (1985 Revision to Control Data Corporation Retirement Plan).) (emphasis added).

ERISA requires the plans to set forth the actuarial assumptions used to compute lump-sum benefits, in order that the plan provides a "definitely determinable benefit" which precludes employer discretion and change without formal amendment. *See* 29 U.S.C. § 1102(b)(4) ("Every employee benefit plan shall ... specify the basis on which payments are made to and from the plan."); *Id.* § 1102(b)(3) ("Every employee benefit plan shall ... provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan ..."); *Id.* § 1102(a)(1) ("Every employee benefit plan shall be established and maintained pursuant to a written instrument."); I.R.C. § 401(a)(25) ("A defined benefit plan shall not be treated as providing definitely deter-

---

**4.** ERISA obligates the sponsor of a defined benefit plan to contribute enough to the plan to pay the benefits earned, but sponsors are not required to build up a surplus over the amount needed to fund these benefits. *See Bigger,* 862 F.2d at 1344.

minable benefits unless, whenever the amount of any benefit is to be determined on the basis of actuarial assumptions, such assumptions are specified in the plan in a way which precludes employer discretion.").

Exhibit B to the 1985 Plan specified the actuarial factors it would use to compute these lump sums: the U.P.1984 Mortality Table and the Pension Benefit Guaranty Corporation (PBGC) rate of interest. The Plan stated:

> Lump Sum Option—the factor to be applied is the product of the factor determined under clause (1) below, multiplied by the factor determined under clause (2) below:
>
> (1) the factor determined on the basis of the U.P.1984 Mortality Table, weighted 60 percent for males and 40 percent for females, with the interest rate for a particular Plan Year being the Pension Benefit Guaranty Corporation rate of interest for immediate annuities, as in effect as of the first day of the Plan Year during which the distribution is made;
>
> (2) the factor determined from the following schedule . . .

(Pls.' Ex. 00094–A (Control Data Retirement Plan 1985 Revision Exhibit B).) Thus, Ceridian needed only Exhibit B, the employee's age and the employee's monthly benefit from the Plan in order to convert a monthly benefit to a lump sum. (*See* Schmidtke Depo. 45–47.)

### III. *The Lump Sum Decision*

In the late 1980s, Ceridian discharged thousands of employees who had earned vested pension benefits. (*See* Defs.' Mem. in Supp. of Mot. for Summ. J. at 2.) ("Defs.' Supp. Mem."). As a result, Ceridian became concerned that its pension plan was getting too big relative to the number of employees. (*See* Wagner Depo. at 39 ("he thought the plan was big and the company was shrinking."); *Id.* at 92 (stating that the Plan was considered "too big" as "the company was getting smaller and the active liability for the plan was getting smaller but with all the inactive participants and the amount of assets, [we had] what we call a plan with a heavy ratio of actives to inactives.").) Ceridi-

an considered this situation problematic because such a large plan can be expensive to administer (*see* Wagner Depo. 24:8–13.), and can give rise to increased future employer obligations. (*See id.* at 25.)

Ceridian was also interested in assisting those employees whom it had laid off in the downsizing effort. (*See* Wagner Depo. 39:11–18; Drabek Depo. 39:7–8; Dawe Depo. 13:13–14.) Therefore, Ceridian decided to amend the 1985 Plan to allow a lump-sum option to *all* employees with vested benefits, not just those who were entitled to vested benefits of five-thousand dollars or less. On December 29, 1989, Ceridian amended the Plan to reflect this change. (*See* Defs.' Supp. Mem. at 2; Pls.' Ex. C00150, C00158–59 (Control Data Retirement Plan, 1989 Revision, Lump Sum Benefit Option).) The resulting plan is the "1989 Plan" at issue in the case at bar.

### IV. *The 1986 Tax Reform Act ("TRA '86")*

During the time the large lump sum option was under consideration, Ceridian also decided to amend the Plan to incorporate the changes in TRA '86. (Schmidtke Depo. 33:19–21) ("In that time frame, if you were going to amend a plan for any reason, you took the opportunity to incorporate the '86 act amendments.")

TPA '86 *allowed* plans offering a lump sum option to use up to 120% of the PBGC rates (rather than 100%) to compute lump sum benefits over $25,000; but there was no requirement that plans do so. *See* Pub.L.No. 99–514 § 1139(a)(B)(i) & (ii); 26 U.S.C. § 411(a)(11)(B)(I) & (II) (1988) ("by using an interest rate *no greater than* 120 percent of the applicable interest rate") (emphasis added) (repealed in 1994 via Pub.L. No. 103–645 § 767(a), now codified at 26 U.S.C. § 411(a)(11)(B) (1994)). For lump sums under $25,000, 100% of the PBGC remained the permissible ceiling. *See* 26 U.S.C. § 411(a)(11)(B)(I)(1988) ("by using an interest rate *no greater than* the applicable interest rate") (emphasis added).

While TRA '86 permitted the adoption of such an amendment, the change needed to be

made by formal amendment.[5] *Cf.* 26 U.S.C. § 401(a)(25) (defined benefit plan not considered to provide definitely determinable benefits unless, when the amount of benefit is to be determined by actuarial assumptions, *"such assumptions are specified in the plan in a way which precludes employer discretion"*) (emphasis added); 29 U.S.C. § 1102(b)(4) ("Every employee benefit plan shall ... specify the basis on which payments are made to and from the plan."); Rev. Rul. 79–90, 1979–1 C.B. 155 ("assumptions to be used must be specified within the plan in a manner which precludes employer discretion.... [including] ... discretion of the employer, plan administrator, actuary, fiduciary, etc."); (Leininger Depo. 298:14–23 (noting that plan administrator does not have the authority to amend the plan).)

The "applicable interest rate" referred to in the statutes was based on the rates issued by the PBGC for plan termination purposes. However, TRA '86 required that if a plan wished to be tax-qualified, it *must* calculate lump sum payments using an array of interest rates known as the PBGC rate for immediate or deferred annuities ("the PBGC immediate or deferred rate"), not just the immediate rate, as previously required. This array included a rate for immediate annuities (those benefits required to commence immediately), and a series of lower rates for those whose benefits were deferred, i.e., to commence later. *See. e.g.,* IRS Notice 87–20 1987–1 C.B. 456 (2/9/87).

Thus, TRA '86 made two changes in the law regarding lump sum calculations: (1) it *permitted, but did not require,* plans to use up to 120%, rather than just 100%, of the applicable PBGC rate in calculating lump sums over $25,000; and (2) it *required* plans to use the PBGC immediate or deferred rates, rather than just the PBGC immediate rates for some benefits.

## V. *Implementing the 1989 Lump Sums*

### 1. *Drafting the Amendment*

Under the Ceridian Plan, "It is the Board of Directors who have the authority to amend the retirement Plan upon the recommendation and advice of the Retirement Committee." (Pls.' Ex. C06496 (Letter written by Ceridian Counsel Barbara A. Leininger regarding revisions to 1989 Plan).) The team that drafted the proposed amendment to the Plan to incorporate the new lump sum benefit included Ceridian's in-house counsel and staff, attorneys at the Minneapolis law firm of Oppenheimer, Wolff & Donnelly, and members of the international benefits consulting firm of Hewitt Associates. (*See* Feldman Depo. 99–100.) The team worked together to complete the amendment. (*See* Leininger Depo. 247–49 (noting that drafts were circulated for comment and review)). The Board of Directors ultimately approved it. (*See id.* at 250–51 (discussing fact that "the board approved the final draft").)

The following language was adopted to implement the lump sum option in the 1989 Plan and to conform that Plan to TRA '86:

> 5.08 *Lump Sum Benefit Option.* A Participant entitled to either an immediate benefit under Section 5.02 or a deferred benefit under Section 5.03 may, upon termination of employment, elect at any time thereafter, subject to the Consent of Spouse requirement, if applicable, to receive his benefit in the form of a one-time lump sum payment determined as follows:
>
> > (A) in the case of a Participant who has attained age 55 as of the date of payment of a lump sum benefit, an amount equal to the present value of the monthly benefit to which the Participant is otherwise entitled commencing as of the date of payment of the lump sum benefit, such present value to be determined in accordance with the actuarial factors set forth in Exhibit B to the Plan, which shall not be less than the applicable Pension Benefit Guaranty interest and mortality factors;
>
> > (B) in the case of a Participant who has not yet attained the age of 55, an

---

**5.** As Mr. Wagner, Ceridian's actuary, noted: A plan document must have a definitely determinable benefit. If there are actuarial factors used to compute the lump sum, they must be set forth in the plan precluding employer discretion. Once the factors are set forth in the plan, the plan administrator does not have the authority to authorize lump-sum computations in a method other than that set forth in the plan. (Wagner Depo. 44–45, 65.)

amount determined by first calculating an actuarial equivalent monthly benefit utilizing the actuarial factors set forth in Exhibit B to the plan, which shall not be less than the applicable Pension Benefit Guaranty Corporation factors as of the date of payment to the monthly benefit the Participant would otherwise be entitled to receive at age 55, and then determining the present value of that actuarial reduced monthly benefit utilizing the actuarial factors set forth in Exhibit B to the Plan, which shall not be less than the applicable Pension Benefit Guaranty Corporation interest and mortality factors.

(Pls.' Ex. C00158–59.)

Exhibit B to the 1989 Plan provided:

*Lump Sum Option*—the factor to be applied is the product of the factor determined under clause (1) below, multiplied by the factor determined under clause (2) below:

(1) the factor determined on the basis of the U.P.1984 Mortality Table, weighted 60 percent for males and 40 percent For females, with the interest rate for a particular Plan Year being the Pension Benefit Guaranty Corporation rate of interest for immediate annuities, as in effect as of the first day of the Plan Year during which the distribution is made;

(2) the factor determined from the following schedule:

. . . . .

(Pls.' Ex. C00199 (Control Data 1989 Plan Revision Exhibit B).) [6] Under Section 5.08, and Exhibit B, Ceridian was to calculate lump sum benefits as follows: the employee's monthly benefit was reduced to its present value using the U.P.1984 Mortality Table and the PBGC rate of interest for immediate annuities. However, in the event that benefit came to less than what it would have been had it been computed under the required PBGC array of deferred rates, Ceridian used

the deferred rates for calculation instead. (*See* Pls.' Opp'n Mem. at 9.) The 1989 Plan was adopted on December 29, 1989. (*See* Defs.' Supp. Mem. at 2).

### 2. Receipt of Benefits

After Ceridian's employees received notice that they would no longer be employed (*see. e.g.*, Pls.' Ex. P000001 (Doyle Memo re: Work Force Reduction)) ("The purpose of this letter is to notify you that you are considered displaced as of May 1, 1989."), they were provided with certificates attesting to their vested benefits. (*See. e.g.*, Pls.' Ex. C 06256 (Certificate of Vested Pension Benefits for Michael A. Doyle).) Ceridian also informed them of their lump sum benefits, and gave them worksheets which supported the computations. (*See, e.g.*, Pls.' Ex. C06216–24 (Control Data Retirement Plan Order for Lump Sum Distribution for K.J. Kiefer, and support documentation).) None of these documents contained the PBGC immediate or deferred rates used in the calculations. (*See id.*)

### VI. The Controversy: 100% v. 120% of the PBGC Rate

Plaintiffs allege that the Plan called for use of 100% of the PBGC rate to determine the lump sum, but. Defendants actually used 120% of the rate, which produced lump sums that were too low.[7] (*See* Pls.' Opp'n Mem. at 1.) Defendants *do not dispute* that they used 120% of the rate; they maintain, however, that they always intended to do so. (*See* Defs.' Reply Br. at 1 ("From the very moment that the Plans first gave employees the choice of selecting an immediate lump sum … [those] lump sums were based on 120% of the PBGC rate.")); *Id.* ("The uncontradicted testimony demonstrates that those involved in the design of the amendment … intended that 120% of the PBGC rate would be used in calculating [the lump sum] payments.").

---

**6.** This is the same language used in Exhibit B to the 1985 Plan. (*Compare* Pls.' Ex. 00094–A *with* Pls.' Ex. C00199.)

**7.** As Defendants explain, if the interest rate is larger, the amount that needs to be invested

*today* to earn a fixed benefit in the *future* is smaller. (*See* Defs.' Supp. Mem. at 5 n. 3.) Thus, the use of the larger interest rate resulted in smaller lump sums for Plaintiffs.

When asked which rate the 1989 Plan, as written, called for, defense witnesses testified as follows: Mr. Schmidtke, an attorney from Oppenheimer, Wolff & Donnelly, stated:

A: Well, my interpretation would be that that means the interest and mortality factors used by the PBGC in plan terminations.

Q: What are those rates?

A: That would be the immediate—for immediate and deferred, for deferred which are actually used by the PBGC.

Q: And not some multiple [the 120%], thereof?

A: I would not interpret a multiple from these words.

(Schmidtke Depo. 96:4–14.) Judith Drabek, an internal benefits administrator at Ceridian, stated:

A: It tells me to use the Pension Benefits Guaranty Corporation rate, you mean?

Q: Does it tell you to use 120 percent of that rate?

A: No. But if the pension benefit guarantee has different rates, I am going to use the appropriate rate. One's 100 percent and one's 120 percent of the PBGC rate.

Q: So you think that a rate can be 120 percent of a rate?

A: Yes, if its allowable under the law.

Q: But there's nothing on here that says that you use 120 percent, is there?

A: No. I don't read that in there [the Plan].

(Drabek Depo. 142:1–13.)

VII. *The 1991 Version of the Plan*

In 1991, Ceridian amended the 1989 Plan, adopting lump sum computational language substantially similar to that in the 1989 Plan. (*Compare* Pls.' Ex. C00158–59 (Control Data Retirement Plan 1989 Revision) *with* Pls.' Ex. C00103–04 (Control Data Retirement Plan 1989 Revision First Declaration of Amendment, Adopted August 1, 1991)) (using similar computational language, but changing relevant age of determination from 55 to 65 years). The amendment applied prospectively.[8] (*See* Pls.' Ex. C00103.) (adopted August 1, 1991, "effective as of September 1, 1991".)

VIII. *McElvain v. Ceridian Corp. ("McElvain")*

In 1992, David A. McElvain ("McElvain"), a retiree under Defendant the SBC Plan, challenged his lump sum benefit computation. (*See generally,* Pls.' Ex. W0061181–50 (*McElvain* Supplemental and Amended Complaint)) ("defendants violated [the Plan] by applying an interest rate equal to 120 percent of the PBGC rate ... rather than 100 percent of the PBGC rate ...")

McElvain began inquiring about his lump sums calculation in a series of correspondence with Michael E. Kotten ("Kotten"), Ceridian's Vice President of Compensation and Benefits. In an April 27, 1992 letter to

---

8. Barbara Leininger, counsel for Ceridian involved in the drafting of the Plan, spoke of the 1991 Amendment in the following way:

Q: Is the only change in the language that you can see between the 5.08 as contained in the '89 plan and the 5.08 as contained in the '91 plan amendment the substitution of age 65 for age 55 at least as appears in 5.08 capital A?
A: Well, 5.08 capital A was designed to ensure that—it's a fail-safe provision under your definition, okay?
Q: Okay.
A: Because you can't have a cutback in an accrued benefit. And that's what 5.08(A) is designed for [a cutback] in the '91 amendment.
Q: Okay.
A: Okay? The 5.08(B), which is really the language that's replacing 5.08 from the '89 amendment, there's some differences in the language from 5.08(B) the '91 amendment and 5.08(B) in the '89 plan.

Q: What was the purpose of those changes, if you know?
A: I don't know.
Q: In connection with the drafting of the '91 version, was there any suggestion that there was any unlawfulness or illegality for any portion of that amendment, of the paragraph 5.08 amendment, that would cause disqualification of the 1989 plan?
A: Not that I'm aware of.
Q: Again, wasn't at least an overarching purpose of the drafting to make certain that no illegality crept into the plan so as to impair the qualification of the plan?
A: Of which drafting?
Q: Of the drafting of the 1991 amendment. Didn't you want the '91 amendment, as with the '89 amendment, the '89 plan, to be qualified and not be unlawful under the IRS rules?
A: Yes.
(Leininger Depo. 375:6–376:16.)

McElvain, Kotten denied McElvain's request for additional benefits. Kotten stated:

> It is true that your Plan benefit arises pursuant to a contract. That contract, however, is the legal Plan document. The law governing tax-qualified pension plans, such as the SBC Retirement Plan, requires a written plan document, which, among other things, provides for defined benefits that are definitely determinable. In this regard, whenever the amount of any benefit is to be determined on the basis of actuarial assumptions, those assumptions *must be specified in the plan in a way that precludes employer discretion.* In addition, Control Data and other Plan fiduciaries have a legal duty to administer the Plan in accordance with its terms.
>
> As noted above, *the Plan document is absolutely clear* on the questions of how your offset and lump sum benefit amounts are to be calculated, and the calculations that have been provided to you are consistent with the document. Use of any other calculation method would be directly contrary to applicable legal requirements.

(Pls.' Ex. W005945 (Kotten Ltr. to McElvain, p. 1 of 3)) (emphasis added). Kotten further noted that with "regard to the lump sum benefit, as noted above, the Plan document is *unambiguous,* consistent with the applicable legal requirements and controlling." (Pls.' Ex. W005946 (Kotten Ltr. to McElvain, p. 2 of 3)) (emphasis added). He stated that "[l]ump sums have been calculated based on 120 percent of the PBGC immediate annuity rate for as long as the lump sum option has been available to participants at any age. All similarly situated participants have been treated the same." (Pls.' Ex. W005947 (Kotten Ltr. to McElvain, p. 3 of 3).)

McElvain asked Ceridian for a complete copy of the SBC Plan documents. Ceridian sent him the documents, including a one-page document labeled "Exhibit B" to the SBC Plan. (Pls.' Ex. W005936–38 (June 18, 1992, Ceridian Mem. to McElvain).) ("In response to your letter dated June 13, I am enclosing the omitted 'Exhibit B.' This was an oversight on our part, and we apologize for that.") Ceridian told McElvain that his lump sum benefit was "derived by calculating a factor to be used in the formula which was provided to [him] by [personnel]. Exhibit B provides for the method to be used in calculating the factor." (*See* Pls.' Ex. W005936.)

McElvain formally appealed his lump sum computation to Ceridian through the benefit claim procedure outlined in the SBC Plan. In a letter dated July 17, 1992, Kotten informed McElvain that his appeal was again denied. (*See* Pls.' Ex. W005953–67 (Kotten Ltr. to McElvain with enclosures).) ("At your direction, your letter will be considered a claim ... thus triggering the benefit claim procedure described" in the Plan.) Kotten maintained that Exhibit B "clearly provid[ed] that the rate to be used [to calculate the lump sum] is 120% of the January 1 immediate rate." (Pls.' Ex. W005957 (Kotten Ltr. to McElvain, p. 5 of 6).) However, he stated that "Although neither Section 8.06(E)(B)(2) nor clause (b) of Exhibit B *expressly incorporate the 120% rate,* these provisions have been so interpreted and consistently applied at all times." (Pls.' Ex. W00598 (Kotten Ltr. to McElvain, p. 6 of 6).) (emphasis added).

On July 31, 1992, McElvain sent Kotten another letter, seeking a "request for review of [Kotten's] decision under Section 6.08(C) of the Plan document." (Pls.' Ex. W005969 (McElvain Ltr. to Kotten, p. 1 of 4).) Kotten again denied McElvain's claim, stating that Ceridian had correctly calculated his benefits, pursuant to "clause (a) of Exhibit B which expressly provides for use of the 120 percent rate." (Pls.' Ex. W005975 (Kotten Ltr. to McElvain, p. 2 of 2).)

On October 6, 1992 McElvain sent another letter to Kotten, in which he stated that, in his opinion, the Exhibit B he had been provided was not the correct Exhibit B. (Pls.' Ex. W005978 (McElvain Ltr. to Kotten).) ("I find that in reviewing all the SBC Retirement Plan documentation provided by you, that Exhibit B of the Plan as it existed on August 31, 1991 was never received.") McElvain asked Kotten to send him the correct Exhibit B. (*Id.*)

On October 14, 1992, Kotten sent McElvain another Exhibit B. (Pls.' Ex. W005981–85 (Kotten Ltr. to McElvain with enclosures).) The cover letter merely stated, "enclosed are the lump sum tables in effect and

constitution Exhibit B for 1990 and the first eight months of 1991 for purposes of computing lump sum benefits ... [under] the SBC Retirement Plan for that period." (Pls.' Ex. W005981.) This Exhibit B was not the same Exhibit B McElvain had previously received, and the cover letter made no reference to the discrepancy.[9] (*See id.*)

McElvain then instigated legal action against Ceridian to recover his full benefits. (*See* Pls.' Ex. W006118–150 (*David A. McElvain v. Ceridian Corp.* Supplemental and Amended Complaint).) On May 30, 1995 the parties reached a settlement. (*See* Pls.' Ex. D (Settlement and Release Agreement).)

### IX. *The 1993 Version of the Plan*

On March 30, 1993, Ceridian amended the Plan to read as follows:

*Lump Sum Option*—The factor to be applied in computing a lump sum benefit for purposes of Section 3.11(a) is the product of the factor determined under item (A) below, multiplied by the factor determined under item (A) below, multiplied by the factor determined under item (B) below. The factor to be applied in computing a lump sum benefit for purposes of Section 3.11(b) is that determined under item (A) below.

(A) The factor determined on the basis of the U.P.1984 Mortality Table, weighted 60 percent for males and 40 percent for females, with the interest rate for a particular Plan Year being (i) in the case of a lump sum the value of which is determined pursuant to Section 3.11(a), *120 percent of the Pension Benefit Guaranty Corporation rate of interest for immediate annuities, as in effect as of the first day of the Plan Year during which distribution is made, or the interest rate determined pursuant*

to clause (ii), whichever results in the greater lump sum benefit.

(Pls.' Ex. C00372 (Plan Amendment)) (emphasis added). The Declaration of Amendment provided that "Except as otherwise provided in the Ceridian Corporation Retirement Plan, such amendment is effective retroactively as of January 1, 1992." (Pls.' Ex. C00314 ("Control Data Retirement Plan Declaration of Amendment").)

### X. *Kiefer and Doyle and the Fourth Declaration of Amendment*

Having retained legal counsel, Kiefer challenged the calculation of his lump sum. (*See* Pls.' Opp'n Mem. at 16.) The record before the Court indicates that Kiefer began inquiring about his benefits as early as May 5, 1994. (*See* Pls.' Ex. C06219 (Holzman Ltr. to Ceridian Corp.).) ("We represent Kenneth Kiefer, a former employee of your company.") He further inquired on November 30, 1994. (*See* Pls.' Ex. C06198 (Hammond Ltr. to Engerman).) ("We viewed your November 30, 1994, inquiry and our January 26 1995, response as informational.")[10] Ceridian considered Kiefer's initial inquiries to be "informational," and therefore, "the procedures applicable to the review of a benefit claim were not followed" in response to this series of correspondence. (*Id.*) Ceridian instructed Kiefer to make a claim for an additional benefit if he so desired. (*Id.*) There is no indication that Kiefer made any further inquiries in response to Ceridian's recommendation.

Doyle also inquired about his benefits. On August 14, 1995, Doyle received a response to his June 6, 1995 letter "regarding the Ceridian Corporation Retirement Plan." (Pls.' Ex. C06243 (Kotten Ltr. to Doyle,

---

**9.** When questioned about the two different Exhibit Bs, Mr. Kotten responded:

A: I believe Mr. McElvain was sent two separate documents because, during the investigation of the McElvain letters that he had sent us, that I believe it was discovered that Exhibit B was missing.

. . . . .

Q: ... You supplied two Exhibit Bs here because there was no Exhibit B to the plan?
A: Um-hum.

. . . . .

Q: Okay. So someone at your direction or Peggy had someone type up this Exhibit B ... ?
A: Someone typed that up.
(Kotten Depo. in *McElvain* 118–20.)

**10.** The Court notes that Plaintiff's Exhibit C06198 appears to be erroneously dated February 8, *1994*. The letter begins, "In response to your January 31, 1995, letter ...," thus leading the court to believe that the letter was actually generated on February 8, *1995*.

8/14/95).) Kotten responded to Doyle's request:

> Your letter suggests that you are attempting to follow the Plan's benefit claim procedure. That procedure, however, only applies to a current participant in the Plan. As I indicated in my letter to you dated May 30, 1995, the lapse of time since you received your lump-sum payment makes any additional review pointless.
>
> As a matter of courtesy, in my capacity as Administrator of the Plan, I have reviewed your lump sum benefit calculation and have determined that your lump-sum benefit was computed appropriately.

(*Id.*); (*see also* Pls.' Ex. C06427 (Kotten Ltr. to Doyle, 5/30/95).) ("Our records indicate that you terminated employment with Ceridian Corporation on June 30, 1989 and were paid a lump sum benefit representing your entire interest in the Plan during September of 1990. On that basis, you are no longer a participant within the meaning of the Plan and have no right to any additional benefits.").

Meanwhile, after Kiefer's initial inquiries, Ceridian implemented its Fourth Declaration of Amendment to the Ceridian Plan on December 30, 1994. (*See* Pls.' Ex. C00300–8 (Ceridian Corporation Retirement Plan Fourth Declaration of Amendment).) This amendment expressly provided for use of the 120% rate, (*see* Pls.' Ex. 00307 ¶ 19) and was "effective as of January 1, 1989." (*See* Pls.' Ex. C00308.)

Kiefer and Doyle filed the instant suit on August 28, 1995. On November 17, 1995, the parties stipulated to, and this Court ordered certification of the following class:

> All persons who received a lump-sum retirement benefit from (a) the Ceridian Corporation Retirement Plan or its predecessor, the Control Data Retirement Plan; (b) the SBC Retirement Plan; (c) the Computing Devices International Retirement Plan; or (d) the EMPROS Systems International Retirement Plan, except those persons who received less than $25,000 (twenty-five thousand dollars) from one of these plans and were age 65 or older on the date of payment.

(*See* Plaintiff Class Certification Order, Doc. No. 16.)

## Discussion

### I. Standard of Review

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Lower Brule Sioux Tribe v. South Dakota,* 104 F.3d 1017, 1021 (8th Cir.1997). The court views the evidence and the inferences which may be reasonably drawn from it in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996); *see also Midwest Printing, Inc. v. AM Int'l Inc.,* 108 F.3d 168, 170 (8th Cir.1997). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Where a moving party, with whatever it provides the court, makes and supports a summary judgment motion, the party opposing the motion may not rest upon the allegations or denials of its pleadings; rather, the -nonmovant must "set forth specific facts showing that there is a genuine issue for trial" *Id.,* 477 U.S. at 256, 106 S.Ct. at 2514; *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir.1995).

Ordinarily, the court does not weigh facts or evaluate the credibility of affidavits and other evidence on a motion for summary judgment. The nonmovant cannot, however, avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. *See Get Away Club, Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir.1992). Essentially, the court performs the threshold inquiry of determining whether there is a need for a trial. *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. at 2510.

Defendants allege that they are entitled to summary judgment because: (1) Plaintiffs'

claims are barred by the statute of limitations; (2) the Plan as amended expressly provides for use of the 120% rate; (3) the Plan administrator's interpretation of the Plan language is entitled to deference and should be upheld; (4) the Plan administrator acted within his discretion in disregarding any scrivener's error in the Plan; and (5) Plaintiffs' claims for breach of contract and conversion have no legal basis. (*See generally* Defs.' Supp. Mem.) Plaintiffs contend that their claims are timely and should survive, and that Defendants' retroactive amendments violate ERISA. (*See generally* Pls.' Opp'n Mem.) The Court will address each argument below.

## II. Statutes of Limitation and Viability of Claims

Defendants allege that Plaintiffs' claims are time-barred because they were not brought within two years of the time Plaintiffs initially received their lump-sum benefits. Plaintiffs advance several different arguments in support of their assertion that their claims are timely, *inter alia*, that the statute of limitations does not begin to run until Plaintiffs knew or should have known that they had a claim. (*See* Pls.' Supp. Mem. at 18–21.)

*Count I—"Violations of ERISA"*

*Time*

■ In Count I of Plaintiffs' Amended Complaint, Plaintiffs bring a claim for the wrongful denial of benefits, alleging that Defendants have violated ERISA "in that defendants have paid benefits to plaintiffs and the Class in amounts which are less than required by ERISA and the Plans." (*See* Pls.' Am. Compl. ¶ 53.) ERISA itself does not contain a statute of limitations for actions to recover plan benefits. *See Adamson v. Armco, Inc.*, 44 F.3d 650, 652 (8th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 85, 133 L.Ed.2d 42 (1995). Thus, the Court looks to Minnesota law for the most analogous state statute of limitations. *See id.; see also Johnson v. State Mut. Life Assur. Co. of Am.*, 942 F.2d 1260, 1261–62 (8th Cir.1991) (noting that district court correctly held that it must look to law of the forum state for the "most analogous statute of limitations"). However, the characterization of Plaintiffs' claims for these purposes is a question of federal law. *See Johnson*, 942 F.2d at 1262.

The Eighth Circuit has determined that a claim for ERISA benefits is to be characterized as a contract action for purposes of determining the statute of limitations. *See Adamson*, 44 F.3d at 652. While Minnesota has more than one statute of limitations for contract actions, the Eighth Circuit has also determined that the two-year statute of limitations set forth in Minnesota Statutes Section 541.07(5)[11] should apply to claims for unpaid benefits. *See id.*[12] Thus, Plaintiffs' claim for improperly computed benefits is governed by a two-year statute of limitations.

---

11. The statute provides in relevant part:
 [T]he following actions shall be commenced within two years:

 (5) For the recovery of wages or overtime or damages, fees or penalties accruing under any federal or state law respecting the payment of wages or overtime or damages, fees or penalties ... ("The term "wages" means all remuneration for services or employment, including commissions and bonuses and the case value of all remuneration of any medium other than cash, where the relationship of master and servant exists and the term "damages" means single, double, or treble damages, accorded by any statutory cause of action whatsoever and whether or not the relationship of a master and servant exists.")
 Minn.Stat. § 541.07(5).

12. Plaintiffs contend that *Adamson* is distinguishable insofar as it involved a claim for "ongoing insurance benefits to claim for unpaid wages," while the instant case involves a "right to vested, protected, non-forfeitable pension benefits." Thus, Plaintiffs maintain, their claims are more analogous to contract claims governed by Minnesota's six-year statute of limitations, Minn.Stat. § 541.05.1.(4), rather than claims for back wages, governed by the two-year statute. (*See* Pls.' Opp'n Mem. at 25.) This Court disagrees.

 As noted in *Adamson*, Minnesota courts have applied the two-year statute broadly and have determined that it applies to "all damages arising out of the employment relationship." *Adamson*, 44 F.3d at 652. Moreover, in reaching its decision in *Adamson*, the Eighth Circuit relied on Minnesota cases dealing with unpaid vacation benefits, salary increases, and adjustments to "all fringe benefits." *See id.* at 652–53. These are cases sufficiently similar to the instant case to satisfy this Court that *Adamson* is applicable here.

*Accrual*

 While the Court has determined that a two-year statute of limitations applies to the instant case, this does not end the inquiry. This Court must also determine when the two-year period starts to run; or the time at which Plaintiffs' claims accrued. Plaintiffs allege that under the "federal discovery rule," their claims did not accrue until they knew or should have known of Defendants' alleged wrongdoing. Because of Defendants' conduct (including fraudulent concealment), Plaintiffs maintain, they could not have discovered the error in the computation of their benefits until long after they received their lump sum payment. (*See* Pls.' Opp'n Mem. at 19–20.) Defendants allege that Plaintiffs' claims accrued when they first received their benefits—Kiefer in August of 1990, and Doyle in September of 1990—and, therefore, their claims are barred by the two-year·statute of limitations (*See* Defs.' Supp. Mem. at 6.) The federal discovery rule provides that a cause of action begins to accrue "as soon as the plaintiff discovers, or reasonably should have discovered" his injury. *Klehr v. A.O. Smith Corp.*, 87 F.3d 231, 238 (8th Cir.1996) (quoting *Association of Commonwealth Claimants v. Moylan*, 71 F.3d 1398, 1402 (8th Cir.1995)), *cert. granted*, —— U.S. ——, 117 S.Ct. 725, 136 L.Ed.2d 643 (1997). Plaintiffs urge this Court to apply the discovery rule, characterizing it as *the Rule* that governs when the statutory period starts to run in a federal question case. (*See* Pls.' Opp'n Mem. at 18.)

While the federal discovery rule is undoubtedly used in the Eighth Circuit in some federal question cases, it is not automatically applied in all federal question cases in all circuits. *See, e.g., Klehr*, 87 F.3d at 238 (noting that *"This circuit* employs a discovery accrual standard to civil RICO claims") (emphasis added). Plaintiffs' Memorandum lists numerous cases applying the discovery rule to federal questions cases which borrow state statutes of limitations. (*See* Pls.' Opp'n Mem. at 19.) Plaintiffs, however, cite no

ERISA case, and this Court is unable to find one within the Eighth Circuit applying this rule.

Instead, the Eighth Circuit has clearly stated that "a cause of action under ERISA ordinarily accrues when benefits are denied."[13] *Mason v. Aetna Life Ins. Co.*, 901 F.2d 662, 664 (8th Cir.1990). Other Circuits have also accepted this position. *See. e.g., Stevens v. Employer–Teamsters Joint Council No. 84 Pension Fund*, 979 F.2d 444, 451 (6th Cir.1992) ("An ERISA cause of action for benefits does not arise until a claim for benefits has been made and formally denied."); *Rodriguez v. MEBA Pension Trust*, 872 F.2d 69, 72 (4th Cir.1989) (stating that cause of action accrues when claim made and formally denied); *Paris v. Profit Sharing Plan*, 637 F.2d 357, 361 (5th Cir.1981) ("We hold that for purposes of ERISA a cause of action does not accrue until an application is denied.")

 The denial must be clearly communicated to the Plaintiff for the cause of action to accrue. *See Fogerty v. Metropolitan Life Ins. Co.*, 850 F.2d 430, 432 (8th Cir.1988) ("Plaintiff's cause of action accrued ... when defendant *clearly* notified plaintiff that she was no longer entitled to disability benefits.") (emphasis added); *see also Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62, 66 (7th Cir.1996) (cause of action accrues upon a "clear and continuing repudiation" of Plaintiffs' claims) (quoting *Martin v. Construction Laborer's Pension Trust*, 947 F.2d 1381, 1385 (9th Cir.1991)); *Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 598 (2d Cir.1983) (stating that cause of action accrues "when there has been 'a repudiation by the fiduciary which is *clear* and made known to the beneficiaries' ") (quotations omitted).

In a "typical" ERISA case, where a participant applies for and is denied benefits and then seeks judicial review of that denial the

---

13. The Court notes, with some confusion, that Plaintiffs also alleged that the Statute of Limitations does not begin to run until their claims were administratively denied; Plaintiffs cited Eighth Circuit case law to support this argument.

(*See* Pls.' Opp'n Mem. at 23.) However, Plaintiffs did not articulate how this argument interfaced with their argument that the Court should apply the discovery rule.

application of this rule is straightforward. The instant case, however, presents a different scenario. Here, Plaintiffs' first encounters with the Plan involved their *receipt* of benefits, not denials. It was not until Plaintiffs inquired about the amount of their benefits and the Plan told them that those benefits had been correctly computed that they were denied the type of relief they seek here. Thus, the Court finds that the statute of limitations did not begin to run until Plaintiffs inquired about their benefit computation and were clearly told that the benefits had been correctly computed.[14] The Court believes this approach is consistent with the case law holding that a cause of action accrues when there is a clear communication of a denial of benefits, and correctly applies Eighth Circuit rules to the unique fact situation at hand. *Cf. Dameron v. Sinai Hosp. of Baltimore, Inc.*, 815 F.2d 975, 982 n. 7 (4th Cir.1987) (finding that cause of action does not accrue until initial decision is reconsidered and employee is notified of that decision). As noted by the Fourth Circuit, "To hold otherwise would require lay participants and beneficiaries to be constantly alert for 'errors and abuses that might give rise to a claim and start the statute of limitations running.'" *Rodriguez*, 872 F.2d at 72 (quoting *Menhorn v. Firestone Tire & Rubber Co.* 738 F.2d 1496, 1498 (9th Cir.1984)).

Applying this rule to the facts of the instant case, the Court determines that Plaintiffs' actions are not time-barred. This action was filed on August 28, 1995. Kiefer began inquiring about his benefits in May of 1994. (*See* Pls.' Ex. C06219.) He further inquired on November 30, 1994. (*See* Pls.' Ex. C06198.) On February 8, 1995, Ceridian responded that it had considered his inquiries "informational" and stated that it had not "made any formal denial of a benefit claim." (*Id.*) Ceridian instructed Kiefer to make an additional, formal claim for benefits if he so desired. (*See id.*) The record does not indicate that Kiefer made any additional inquiries.

The Court need not resolve the unique issues presented by Kiefer's situation. Though he has not, apparently, received a clear denial of his benefits, neither party asserts that Kiefer's claim has *not yet* accrued. Even if the Court were to find that the claim accrued when Kiefer *started* his inquiry, in May of 1994, his claim is well within the two-year statute of limitations.

Doyle's claim is also timely. In May of 1995, Ceridian told Doyle, in response to his inquiry, that he was "no longer a participant within the meaning of the Plan" and had "no right to any additional benefits." (Pls.' Ex. C06427.) While Doyle did correspond further with Ceridian, and received a subsequent denial of his claims, (*see* Pls.' Ex. C06243) at the *earliest*, Doyle's claim accrued in May of 1995. Thus, his claim is also within the two-year statute of limitations. Plaintiffs' claims for denial of benefits are not time-barred.

*Count II—Breach Fiduciary Duty*

█ Plaintiffs allege that Defendants' conduct constitutes a "breach of their fiduciary duties to Plaintiffs and the Class," and they bring a separate claim for breach of fiduciary duty under ERISA. *See* 29 U.S.C. § 1104 (fiduciary duties); § 1132(a)(3) (civil enforcement); (Pls.' Am. Compl., Count II.) They ask this Court to apply ERISA's statute of limitations for such claims,[15] which provides that, in the case of fraud or concealment an action for breach of fiduciary duty "may be commenced not later than six years after the date of discovery." 29 U.S.C. § 1113. Defendants contend that Plaintiffs' claim for breach of fiduciary duty fails because (1) plaintiffs lack standing to bring such a claim as they are no longer plan participants (*see*

14. The Court notes that this finding does not constitute a decision on the requirement that Plaintiffs exhaust their administrative remedies, including whether such exhaustion may be deemed futile, and, therefore, unnecessary. *See Sioux Valley Hosp. v. Bowen*, 792 F.2d 715, 724 (8th Cir.1986) ("when an administrative appeal would be futile and little more than a formality, exhaustion will not be required.")

15. Though it is unclear, Plaintiffs also seem to ask the Court to apply the six-year statute to all of their claims. (*See* Pls.' Opp'n Mem. at 25.) Having already addressed the issue of the appropriate time period for Plaintiffs' claim for denial of benefits, the Court need not address the issue of the applicability of the six-year period to all claims.

Defs.' Supp. Mem. at 7–8), and (2) such claims are barred as a matter of law where Plaintiffs can seek additional benefits under other provisions of ERISA. (*See* Defs.' Reply Mem. at 27–28.) The Court finds the latter argument dispositive and need not reach the former.

In *Varity Corp. v. Howe*, — U.S. —, —–––——, 116 S.Ct. 1065, 1075–79, 134 L.Ed.2d 130 (1996), the Supreme Court recognized that equitable relief under 29 U.S.C. § 1132(a)(3) is available to individual plan participants and beneficiaries. The Court also held that "characterizing a denial of benefits as a breach of fiduciary duty does not necessarily change the standard a court would apply when reviewing the administrator's decision to deny benefits." *Id.* at —, 116 S.Ct. at 1079. The Supreme Court went on to state that, because the statute authorizes "appropriate" equitable relief, "we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will be no likely need for further equitable relief, in which case such relief would not normally be 'appropriate'." *Id.*

In *Wald v. Southwestern Bell Customcare Medical Plan*, 83 F.3d 1002, 1006 (8th Cir. 1996), the Eighth Circuit, applying *Varity*, found that "equitable relief would not be appropriate" where a .plaintiff was provided adequate relief by her right to bring a claim to recover benefits under 29 U.S.C. § 1132(a)(1)(B), and sought no different relief in her claim for breach of fiduciary duty. *See id.* 83 F.3d at 1006. This is the case presented here, and thus, Plaintiffs may not maintain a separate claim for breach of fiduciary duty. *Id.*

Under 29 U.S.C. § 1132(a)(1)(B), a plan participant may sue "to recover benefits due ... under the terms of [the] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." Plaintiffs allege the following damages,[16] due to Defendants' alleged conduct:

a) Loss of lump sum benefits

b) Loss of accrued and vested benefits under the Plan;

c) Loss of interest on such sums;

d) Loss of funds that Plaintiffs and members of the Class entrusted to the defendants to manage and invest; and

e) Counsel fees and costs incurred in connection with the litigation of this matter.

(Pls.' Am. Compl. ¶ 85.) They seek to recover "equitable, restitutionary or other relief or the damages determined to have been sustained by each of them respectively and that judgment be entered against the defendants." (*Id.* § H(a).) They also seek fees and costs and any further relief this Court deems appropriate. (*Id.* at (b) & (c).)

The Court finds the remedies Plaintiffs seek are adequately reflected in the relief available under § 1132(a)(1)(B), under which Plaintiffs maintain their claim for benefits. This finding is buttressed by the fact that Plaintiffs' claims for damages are, essentially, limited to the allegedly unrefunded benefits and related cost. Plaintiffs have available appropriate relief under § 1132(a)(1)(B), and seek no additional relief arising out of Defendants' alleged breach of duty. Thus, under *Wald*, their claims for breach of fiduciary duty cannot survive. *See Wald*, 83 F.3d at 1006 ("Because Wald is provided adequate relief by her right to bring a claim for benefits ... as she did in Count I, and she seeks no different relief in Count II of her complaint, equitable relief would not be appropriate in her case. Thus, she does not have a cause of action ...") This Court need not reach the issue of the appropriate statute of limitations for a claim for breach of fiduciary duty. Accordingly, the Court will grant Defendants' Motion with respect to Count II (Breach of Fiduciary Duty) of Plaintiffs'. Amended Complaint.

*Counts III & IV—Common Law Breach of Contract and Conversion*

▪ Plaintiffs also allege separate common law counts for Breach of Contract and Conversion. (*See* Pls.' Am. Compl., Counts III & IV). In their Amended Complaint,

---

16. The Court observes that Plaintiffs have alleged damages including "but not limited to" the following. (Pls.' Am. Compl. ¶ 85.)

Plaintiffs did not specify whether these claims were brought pursuant to state or federal common law, (*see id.*), though they now allege in their Memorandum that these are federal common law claims. In either case, these claims are preempted by ERISA's comprehensive enforcement scheme, and the Court need not reach the issue of determining their statutes of limitation.

The express preemption provisions of ERISA are "deliberately expansive, and 'designed to establish pension plan regulation as exclusively a federal concern.'" *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987) (quotation omitted); *see also* ERISA § 514(a), 29 U.S.C. § 1144(a). ERISA preempts state law claims that "relate to" employee benefit plans. *See id.*, 481 U.S. at 45, 107 S.Ct. at 1552, 29 U.S.C. § 1144(a); *see also Shea v. Esensten*, 107 F.3d 625, 627 (8th Cir.1997) ("the language of ERISA's preemption clause sweeps broadly, embracing common law causes of action if they have a connection with or reference to an ERISA plan.") The common law causes of action asserted in plaintiffs' complaint clearly "relate to" an employee benefit plan and, therefore, they fall under ERISA's express preemption clause.

Count III of the Amended Complaint is captioned "Breach of Contract—Failure to Pay Required Benefits," and alleges that "Defendants' conduct constitutes a breach of the Plans, a violation of ERISA, and breach of defendants' agreement to provide benefits." (*See* Pls.' Am. Compl. ¶ 59.) This plainly "relates to" the Plan at issue and, insofar as it is a state law claim, ERISA preempts it. *See Walker v. National City Bank*, 18 F.3d 630, 634 (8th Cir.1994) ("Clearly, if the claim is one for state law breach of contract, the claim is preempted by ERISA.") Count IV of the Amended Complaint, "Conversion," alleges that "Defendants have converted to their own use and benefit, and refused on demand to return, funds to which plaintiffs and the Class are entitled under the Plans." (*See* Pls.' Am. Compl. ¶ 62.) Thus, this claim also "relates

to" the Plan and, insofar as it is a state law claim, ERISA preempts it.

Moreover, Plaintiffs cannot maintain these claims by characterizing them as common law claims. While federal courts are authorized to develop a federal common law under ERISA, *see Pilot Life*, 481 U.S. at 56, 107 S.Ct. at 1558; *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109–111, 109 S.Ct. 948, 953–54, 103 L.Ed.2d 80 (1989) (supplying standard of review to "fill this gap" left by the statute), Plaintiffs may not circumvent the statutory enforcement scheme by bringing freestanding claims for breach of contract and conversion when the statute itself adequately provided for those claims. *See, e.g., Mertens v. Hewitt Assocs.*, 508 U.S. 248, 258–60, 113 S.Ct. 2063, 2070, 124 L.Ed.2d 161 (1993) ("The authority of courts to develop a 'federal common law' under ERISA ... is not the authority to revise the text of the statute."); *Slice v. Sons of Norway*, 34 F.3d 630, 634 (8th Cir.1994) (stating that "the Eighth Circuit to date has not seen fit to recognize a federal common law right of action in ERISA cases," but indicating that "in some circumstances" courts may fashion an action for equitable estoppel); *Pacificare, Inc. v. Martin*, 34 F.3d 834, 836 (9th Cir. 1994) ("the Supreme Court's approval of the development of a federal common law under ERISA does not authorize the creation of federal common law causes of action. 'The federal common law that the Court envisioned relates to rights and obligations under the ERISA plan and not to causes of action....'") (quotations omitted). Accordingly, the Court finds that ERISA's comprehensive enforcement scheme preempts these claims, and it need not reach the issue of the proper statutes of limitations. This Court will grant Defendants' Motion for Summary Judgment as to Counts III (Breach of Contract) and IV (Conversion) of Plaintiffs' Amended Complaint.

### III. The Retroactive Amendment

■ Defendants allege that they are entitled to summary judgment on Plaintiffs' claims for benefits because the Fourth Declaration of Amendment of the Plan expressly provided for the use of the 120% rate, and it

applies retroactively to January 1, 1989. (*See* Defs.' Supp. Mem. at 9.) Plaintiffs respond that this amendment violates ERISA's anti-cutback provision. (*See* Pls.' Opp'n Mem. at 28–33.)

Defendants allege that this amendment was made pursuant to I.R.C. § 401(b), which provides for a "remedial amendment period" during which amendments to a plan may be applied retroactively. This section also authorizes the IRS, through the Secretary of the Treasury, to extend that remedial amendment period. *Id.* Defendants maintain that the period following TRA '86 was repeatedly extended, allowing retroactive amendments through December 31, 1994. (*See* Defs.' Supp. Mem. at 11.)

ERISA's anti-cutback provision, 29 U.S.C. § 1054(g), provides:

> (1) The accrued benefit of a participant under a plan *may not be decreased by an amendment of the plan,* other than an amendment described in section 1082(c)(8) or 1441 of this title.
>
> (2) For purposes of paragraph (1), a plan amendment which has the effect of——
>
> > (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy.... with respect to benefits attributable to service before the amendment *shall be treated as reducing accrued benefits.*
>
> . . . . .

29 U.S.C. § 1054 (emphasis added).

The parties dispute neither that the plans involve accrued benefits, nor that the use of 120% of the PBGC rate instead of 100% results in reduction of an accrued benefit. Defendants state that the 1994 amendment entitles them to summary judgment, "unless for some unknown reason [it] cannot be applied." (*See* Defs.' Supp. Mem. at 8.) ERISA's anti-cutback provision provides just that reason.

■ A change in computational methodology which eliminates or reduces a benefit is a prohibited cutback. *See Costantino v. TRW, Inc.,* 13 F.3d 969, 978 (6th Cir.1994) (affirm-

ing district court's holding that Defendants' 1986 Plan amendment "violated the anti-cutback rules by eliminating a subsidy for which Plaintiffs already qualified."); *Shaw v. International Ass'n of Machinists & Aerospace Workers Pension Plan,* 750 F.2d 1458, 1463–65 (9th Cir.1985) (finding that amendment that decreasing an accrued benefit violates 29 U.S.C. § 1054(g)). Defendants' retroactive amendment reduced Plaintiffs' benefits and, therefore, violated the anti-cutback provision.

Defendants contend that the 1989 Plan was illegal (i.e., did not comply with TRA '86) because it did not require use of PBGC deferred rates, and thus, the retroactive amendment was necessary to bring the Plan into compliance. The Court disagrees.

First, the Court believes that, as written, the language contained in both §§ 5.08(A) and (B) of the 1989 Plan required that the interest rates used for lump sum benefits would include the deferred rates, if necessary, to comply with ERISA. The Plans' drafters have so testified. For example, Mr. Reikstyl from Hewitt and Associates testified that the "not less than" language at the end of subparagraphs (A) and (B) of § 5.08, was what the plan "needed to guarantee that the resulting lump sum would comply with the law regarding how to calculate lump sums." (Reikstyl Depo. 39:2–14.) Mr. Reikstyl further testified:

> Q: ... Is it fair to say that you would understand these last three lines of subparagraph A to be a reference to both the immediate and deferred PBGC rates?
>
> A: Generally, yes. I would read those last three lines to apply to what the Pension Benefit Guaranty Corporation has said is a legally required minimum amount of—procedure to calculate such a minimum amount of lump sum.
>
> Q: And that would be, at this point in time in 1990, the immediate and deferred, right?
>
> A: I believe that's correct. I don't recall the exact date of the changes in the law.

(Reikstyl Depo. 40:23—41:11.); (*see also* Leininger Depo. 353–56).[17]

Thus, the Plan did not need to be amended in that regard in order to comply with TRA '86.

---

**17.** In addition, as previously noted, TRA '86 allowed, but did not require, use of the 120% rate.

Second, and most important, even if the 1989 Plan amendment failed to comply with TRA '86, Plaintiffs' alleged efforts to conform to TRA '86 does not allow them to violate ERISA itself. The IRS Regulations which waived the time limits for amendments did not waive ERISA's prohibitions on benefit cutbacks. As the IRS has clearly stated:

> Although section 1140 of the Tax Reform Act of 1986 and section 401(b) permit an extended period of time for amending plans to comply with the Tax Reform Act of 1986 ... neither section provides an exception to section 411(d)(6), with respect to plan amendments made to comply with TRA 86 after benefits accrue during the 1989 or 1990 plan year.

IRS Notice 89–92, 1989–2 C.B. 410. *See also* IRS Notice 90–73, 1990–2 C.B. 353 (noting that extension of remedial amendment period does not provide an exception to the anti-cutback rule); 1/1/95 IRS Field Directive, (Pls.' Ex. G) ("in making corrections, a plan is not permitted to cut back benefits accrued during the TRA '86 remedial amendment period."); *Costantino*, 13 F.3d at 978 ("Besides, if an IRS ruling were to allow such an elimination, it would be contrary to the express language of the anti-cutback rules ... and so, the ruling would be invalid.").[18]

Accordingly, the Court finds that Defendants' 1994 retroactive amendment violates ERISA's anti-cutback provisions, and Defendants are not entitled to summary judgment on this basis.

## IV. Administrative Discretion

Defendants allege that the Plan documents, taken as a whole, are ambiguous, and that the plan administrator's resolution of the ambiguity is entitled to deference. (*See*

---

**18.** In light of the foregoing, the Court finds irrelevant the IRS' determination that Defendants' 1994 retroactive amendments was proper. (*See* Defs.' Ex. 18. (8/24/96 IRS Determination Letter Re: Ceridian Plan)). Moreover, the text of the letter expressly states, "This letter relates only to the status of your plan under the Internal Revenue Code. *It is not a determination regarding the effect of other federal or local statutes.*" (*Id.*) (emphasis added).

**19.** The relevant provision states:

Defs.' Supp. Mem. at 12–16.) The Court finds the Plan unambiguous.

### Abuse of discretion

ERISA itself does not specify a standard of review of an administrator's decision; however, the Supreme Court has held that a reviewing court should use a *de novo* standard of review unless the plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Donaho v. FMC Corp.*, 74 F.3d 894, 897 (8th Cir.1996) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989)); *Wilson v. Prudential Ins. Co. of Am.*, 97 F.3d 1010, 1013 (8th Cir.1996). If the plan gives such discretionary authority, the court reviews the plan administrator's decision for abuse of discretion. *Donaho*, 74 F.3d at 898.

It is undisputed that the language of the Plan is discretionary,[19] and thus, this Court should utilize the abuse of discretion standard. Acting contrary to the unambiguous language of the Plan, however, constitutes an abuse of discretion. *See Lickteig v. Business Men's Assur. Co. of Am.*, 61 F.3d 579, 585 (8th Cir.1995) (citing cases); *Kennedy v. Georgia–Pacific Corp.*, 31 F.3d 606, 610 (8th Cir.1994) (finding abuse of discretion where administrator's interpretation contradicts plain language of the plan).

### Ambiguity

When interpreting an ERISA plan, its plainly stated terms "should be accorded their ordinary and not specialized, meanings." *Wilson v. Prudential Ins. Co. of Am.*, 97 F.3d 1010, 1013 (8th Cir.1996) (quoting *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150, 154 (8th Cir.1990)). Plan language

> [T]he Retirement Committee and the Administrator are empowered to make and enforce such rules and regulations as they deem necessary or proper for the efficient administration of the Plan, and to interpret the plan and decide any and all matters arising thereunder, including the power to remedy possible ambiguities, inconsistencies, omissions or erroneous benefit determinations.
>
> (Defs.' Ex. 2, C00141 (1989 Plan § 3.05).)

is ambiguous when it is reasonably susceptible to more than one interpretation. *Id.*

██ The Court finds that the language of the 1989 Plan is unambiguous with regard to the use of the 100% rate. The language in Exhibit B clearly calls for "the interest rate for a particular Plan Year being the Pension Benefit Guaranty Corporation rate of interest for immediate annuities, as in effect as of the first day of the Plan Year during which the distribution is made." (Pls.' Ex. C00199) As Defendants themselves have testified, this language plainly calls for the use of the PBGC rate in computing lump sum benefits; there is no mention of the 120% rate. (*See* Yager Depo. 53:21–54:5 (testifying that plan tells administrator to use the PBGC rate)); Drabek Depo. 142:11–13 (Q: "... there's nothing on here that says you use 120 percent is there? A: "No. I don't read that in there."). In his correspondence with McElvain, Kotten himself characterized the Plan as "absolutely clear" and "unambiguous." (*See* Pls.' Ex. W005945–46.)

Defendants allege that the Plan is ambiguous because of the aforementioned "impermissible" reference to only the PBGC immediate rate in Exhibit B, rather than both the immediate and deferred rates. (*See* Defs.' Supp. Mem. at 14–16.) Even if this ambiguity were to exist, it is not an ambiguity with respect to the use of the 100% rate. Thus, the administrator's decision to use the 120% rate was not responsive to this particular ambiguity. (*See* Schmidtke Depo. 72:23–24) ("The 120 percent would not be a cure or fix for that particular ambiguity.").

Because the administrator acted contrary to the plain meaning of the unambiguous language of the Plan, this Court will not defer to the administrator's interpretation. Defendants' argument is unavailing.

*V. Scrivener's Error*

██ Last, Defendants maintain that if "there is any remaining question as to whether the Plan can be read to permit use of 120% of the PBGC rate in calculating large lump sums, the Court should defer to the Plan Administrator's reasonable judgment that the Plan may have contained a drafting error, and that the error should be disregarded and corrected." (Defs.' Supp. Mem. at 16.) Defendants maintain that the administrator had discretion to apply the "equitable doctrine of the scrivener's error" to reform the plan to reflect the intent of the parties. (*Id.*) Apparently, Defendants ask the Court to infer that the administrator used the doctrine of the scrivener's error in his calculation of benefits, thus, making his determinations acceptable. This Court will decline the invitation.

Without reaching the issue of whether there was actually any error on the part of Defendants, the Court finds the application doctrine of the scrivener's error inappropriate in the instant case.[20] This finding is bolstered by the Court's determination that the Plan was unambiguous with regard to use of the 100% rate. *See Cinelli v. Security Pacific Corp.*, 61 F.3d 1437, 1445 (9th Cir. 1995) (declining to apply doctrine because plan "documents contain a clear statement of benefits and it would be inconsistent with the goal of ERISA to allow either [party] to attach [a] statement on the basis of mistake. We decline to apply the doctrine of mistake in this instance to consider the intent of the parties.") (citing cases). As noted by the Fourth Circuit:

When persons with the power to amend a plan come to recognize that it needs to be amended to reflect a change of circumstances, that recognition alone does not effect an amendment of the plan, even though that may have been their firm intent. Until the plan is in fact amended, intent to do so is nothing more than that, and the plan's terms remain as written. Both state law and ERISA cases manifest a strong policy that plans be in writing, and for good reason. The parties and beneficiaries should be entitled to plan their financial affairs with some certainty about that to which they are entitled, and fiduciaries should be guided clearly in the administration of plans by a definitive writ-

---

**20.** The Eighth Circuit has not addressed the issue of the applicability of the doctrine of the scriven- er's error in ERISA cases.

ing and not by the vagaries of oral under-standings.

*Gamble v. Group Hospitalization & Med. Serv., Inc.,* 38 F.3d 126, 131 (4th Cir.1994). Accordingly, this Court will not apply the doctrine of the scrivener's error to the in-stant case. Defendants' Motion for Sum-mary Judgment will be denied with respect to Count I (violations of ERISA) of Plaintiffs' Amended Complaint.

### Conclusion

Accordingly, based on all the files, records, and proceedings herein, **IT IS ORDERED** that the Defendants' Motion for Summary Judgment (Doc. No. 26) is **GRANTED** with respect to Count II (Breach of Fiduciary Duty); Count III (Common Law Breach of Contract); and Count IV (Common Law Fraud) of Plaintiffs' Amended Complaint (Doc. No. 44), and Counts II, III, & IV are **DISMISSED WITH PREJUDICE**; and is, in all other respects, **DENIED.**

### *ORDER*

Before the Court is Defendants' Motion to Modify the Court's May 5, 1997 Opinion and Order, and to Certify the Court's Order for Interlocutory Appeal.

The Motion will be denied. The Court is satisfied that the record before it at the time the summary judgment motion was submit-ted supports the language now objected to by Defendants. At trial, additional evidence on that issue may result in a different conclu-sion. This case is now set for trial on August 26, 1997 with an estimated length of three days. No savings in court time is apparent to the undersigned by certifying a single issue for appeal now.

Upon all the files, records and proceedings herein, including the Memoranda of counsel in support of, and in opposition to the pend-ing Motion, **IT IS ORDERED** that "Defen-dants' Motion to Modify the Court's May 5, 1997 Opinion and Order, and to Certify the Court's Order for Interlocutory Appeal" is in all respects, **DENIED.**